[File No 7116]

MYRON MILLER, Appellant, v. AGNES MILLER, Respondent.

(38 NW2d 35)

Opinion filed May 17, 1949. Rehearing denied June 24, 1949.

*Lyche & Lyche,* for appellant.

*Conmy & Conmy,* for respondent.

MORRIS, J. The plaintiff and the defendant were married at Moorhead, Minnesota in November 1942. On July 5, 1947 the plaintiff caused a summons and complaint to be personally served on the defendant whereby the plaintiff sought a divorce upon the grounds of extreme cruelty. On July 14, 1947 the parties

entered into a written stipulation and agreement which provided that the defendant was to have custody of the minor children of the parties, subject to the right of the plaintiff to visit them at reasonable times and places. It was also agreed that the defendant was to have the house of the parties located in Finley, North Dakota, and the furniture and personal property therein, except the plaintiff's personal effects. The plaintiff agreed to pay off a mortgage on these premises, and to pay the defendant until further order of the court, as alimony and support money, one-third of his monthly earnings not exceeding $100.00 per month. The defendant made no appearance in the action and on August 12, 1947 judgment was entered against the defendant by default. This judgment incorporated the provisions of the stipulation regarding custody of the children, property, and alimony payments. The plaintiff handed to the defendant a copy of this decree about the middle of August.

After the divorce was granted the defendant consulted an attorney and through him arrangements were made whereby the house was deeded over to the defendant in compliance with the stipulation, and decree of the court. The plaintiff paid off the mortgage. The defendant later deeded the house to her mother but has the privilege of living in it. Her explanation is that the conveyance of the house was made in order to get money to pay bills. The defendant states that the plaintiff has paid her only $48.00 up to the time of the application. The plaintiff contends that he paid her much more but names no amount. It is a fair inference that he has not complied with his stipulation and the court's order to pay one third of his earnings not exceeding $100.00 per month.

The plaintiff was remarried on August 21, 1947. About two weeks before Christmas the second wife gave birth to a child that lived but a few hours. At the time the divorce was granted the defendant was also pregnant and gave birth to a child on September 5. This was the fifth child born to the parties. No mention was made of the defendant's condition in connection with the divorce proceedings. The plaintiff claims he did not know of it. The plaintiff named only three children in the complaint. The name of the oldest child was omitted because it had

been born two months after the marriage of these parties and they represented to the defendant's relatives that this child was adopted.

On March 29, 1948 the defendant made a motion to have the default divorce decree set aside and that she be relieved of default and be permitted to answer. She alleges mistake and inadvertence on her part which was brought about by the fraud of the plaintiff. She particularizes this alleged fraud by stating in substance these facts. The plaintiff, she says, told her that he was responsible for the pregnancy of a minor and that he would go to jail unless he could divorce the defendant and marry the girl for whose condition he was responsible. He also told her that after the child was born he would divorce his second wife and remarry the defendant. Believing these representations to be true and relying upon his promise to remarry her, the defendant permitted the plaintiff to obtain a default divorce. She also alleges that the plaintiff perpetrated a fraud on the court by failure to name the oldest child in the proceedings, or to inform the court that the defendant was expecting the birth of a fifth child.

The trial court granted the defendant's motion to set aside the default decree and the plaintiff appeals.

The plaintiff categorically denies the alleged statements regarding the minority of his prospective second wife who in fact was not a minor and also denies that he promised to divorce her and remarry the defendant.

Section 28-2901, Rev Code ND 1943 vests discretionary power in the district court to relieve a party from a default judgment upon the grounds that it was taken against him through his mistake, inadvertence, surprise or excusable neglect. Applications under this section are addressed to the sound judicial discretion of the trial court and his disposition thereof will not be disturbed on appeal, unless it plainly appears that the court abused such discretion. Mantel v. Pickle, 56 ND 568, 218 NW 605, and cases cited therein. That discretion must, nevertheless, be exercised in accordance with recognized rules. Such an application is an appeal to the equitable powers of the court and

is to be disposed of upon equitable principles. Smith v. Smith, 71 ND 110, 299 NW 693; Guenther v. Funk, 67 ND 543, 274 NW 839, 112 ALR 428. This rule applies when the vacation of a judgment is sought upon the ground of fraud. Freeman, Judgments 5th ed §§ 233, 234; 31 Am Jur, Judgments §§ 734, 735. Only extrinsic fraud may be urged in support of such an attack upon a judgment. Schillerstrom v. Schillerstrom, 75 ND 667, 32 NW2d 106, 2 ALR2d 271.

The burden is on the defendant to sustain her charges of fraud. Reppert v. Reppert, 214 Iowa 17, 241 NW 487; 17 Am Jur, Divorce and Separation § 458. The showing of fraud must be clear and convincing. Walters v. Walters, 151 Minn 300, 186 NW 693.

This case is similar in some respects to Henderson v. Henderson, 32 ND 520, 156 NW 245, wherein it is said, "having consented to the decree in order to aid her husband, she cannot question its validity by merely showing that the husband has failed to keep his agreement to remarry her, especially after the husband has married another woman." But in that case the wife who sought to have the divorce decree set aside had instituted the action in accordance with an agreement with her husband that she should obtain the divorce, under the mistaken belief that it was necessary to enable her to testify for her husband in a criminal action in which he was charged with embezzlement. The husband agreed that after his troubles were over he would remarry the plaintiff but instead married another woman. In that case it was said that she had good grounds for a divorce against her husband for adultery and probable desertion. The only fraud practiced on her was the failure of the husband to keep his promise to remarry her. Her testimony showed that she still believed that the defendant was guilty of adultery and in that respect the decree was correct. The Supreme Court reached the conclusion that "the divorce was not obtained by any fraud practiced upon her."

In this case the defendant attacks a judgment which was obtained against her by default. It was rendered on August 12, 1947. These proceedings to have the judgment vacated were instituted March 29, 1948, well within the year in which a party

may seek relief from a judgment taken against him through his mistake, inadvertence, surprise, or excusable neglect under the provisions of § 28–2901, Rev Code ND 1943.

The transcript in the original divorce proceeding is before us. The plaintiff was the chief witness in his own behalf. After testifying to the parties' marriage and their citizenship he further testified as follows:

"Q. And do you have any children?
A. Three.
Q. Will you give their names?
A. Alwood, Malayne, and Vernon.
Q. And their ages are three, two and one?
A. Yes.
Q. Have you and your wife been getting along?
A. Not very well.
Q. Has she called you names?
A. Yes.
Q. What names has she called you?
A. She called me an old bitch and other names.
Q. Has she socially charged you with chasing around with other women?
A. Yes.
Q. And has she refused to cohabit with you and live with you as man and wife?
A. Yes.
Q. And that has been over a period of many months now?
A. Yes.
Q. Has she told you that she doesn't care for you anymore?
A. Yes.
Q. What is her attitude towards keeping up the home? Does she want to do her own part there?
A. Sometimes she does and sometimes she doesn't.
Q. Has she ever left you?
A. Yes, she has left me many times.
Q. And how long would she stay away?
A. For three weeks to a month at a time.

Q. And because of this conduct on her part have you worried about it?

A. Yes.

Q. And have you become nervous?

A. Yes.

Q. And have you lost sleep?

A. Yes.

Q. And it has had a bad effect on your health?

A. Yes."

This is all of plaintiff's testimony bearing upon grounds for divorce. The only corroborating testimony produced at this hearing is as follows:

"Q. What is your name?

A. Conrad Smithrud.

Q. Are you acquainted with Mr. and Mrs. Miller?

A. Yes, I am.

Q. You have been in their home?

A. Yes. I roomed there.

Q. Have you had occasion to observe how they get along?

A. Yes. I have.

Q. You have heard them quarreling?

A. Yes.

Q. Have you ever heard her nagging at him?

A. Yes.

Q. Did you ever hear her call him a name?

A. Yes.

Q. Will you name one name you heard her call him?

A. An old bitch."

The plaintiff would make much of the fact that the defendant signed a stipulation for a property settlement which he introduced in evidence as Exhibit A. His testimony at the hearing and her conduct in agreeing to a property settlement and permitting the decree to be entered against her by default must be viewed in the light of this background. He was an admitted adulterer. At the time the divorce was granted the parties had been married four years and nine months. During that period the defendant had borne the plaintiff four children one of whom

he omitted to mention in his testimony. In less than a month after the hearing she bore him a fifth child whose approaching birth was also unmentioned. In the face of these facts he charged the defendant with mental cruelty because he said she accused him of chasing around with other women and refused to cohabit with him as man and wife. We point out these facts not to intimate that perjury is a ground for vacating a divorce decree but because they have a bearing on the defendant's credibility in this proceeding. They also show the conditions that confronted the defendant when she was induced to permit the plaintiff to obtain a default divorce decree. They are circumstances to be considered in determining whether her default is excusable. Rehfuss v. Rehfuss, 169 Cal 86, 145 P 1020; Carmichael v. Carmichael, 106 Or 198, 211 P 916; Petersen v. Petersen, 221 Iowa 897, 267 NW 719; Cobb v. Cobb, 43 SD 388, 179 NW 498.

Unfortunately there are parties other than the quarreling litigants who have a vital interest in the matter before the court. They are the two of the five children of the parties, one of them unborn at the time of the decree. Neither was mentioned in the complaint, the stipulation, or in the testimony at the divorce hearing. This record does not yet disclose the name or sex of either the oldest or youngest child. The plaintiff in his affidavit in response to the motion to vacate states:

"That the oldest child of the defendant was born at the Florence Crittenton Home in Fargo, North Dakota about a month after her marriage to the plaintiff; that the defendant has given the public to know that said child is adopted and has some kind of papers purporting to substantiate her claim; that she always insisted that the plaintiff and herself consider this child as adopted, and it was for that reason that it was not mentioned in the divorce papers; that the plaintiff honestly did not know that the defendant was pregnant at the time the divorce was obtained." His statement regarding the oldest child is not challenged by the defendant. His statement regarding the youngest is controverted and is contrary to the normal experience of mankind. His affidavit, in contrast with his lack of frankness at the divorce hearing, also states that his second wife is again pregnant. This statement, if true, further aggravates this unfortu-

nate situation, but his fecundity does not render the court impotent to exercise its equitable powers in behalf of his children by his first marriage who are directly affected. The plaintiff is the prime mover in a fraud upon his wife, his children, and the court.

In Young v. Young, 17 Minn 181, 17 Gil 153, it is said, "in an action for divorce, any course of action by the plaintiff which is intended to and does prevent the defendant from setting up and establishing a defense to the action is a fraud upon the administration of justice, as well as upon the defendant, for which the judgment thereby procured will be set aside." This passage is quoted in the more recent case of Cahaley v. Cahaley, 216 Minn 175, 12 NW2d 182, 157 ALR 1. See also Rehfuss v. Rehfuss, 169 Cal 86, 145 P 1020, supra; Graham v. Graham, 54 Wash 70, 102 P 891, LRA1917B 405, 18 Ann Cas 999; Pringle v. Pringle, 55 Wash 93, 104 P 135.

The rights and welfare of the children are paramount to those of the litigants. The concealment of their existence was a fraud upon them and upon the court whose duty it was to provide for them regardless of the desires, motives, or mistakes of their parents. The record clearly shows that he was deprived of the opportunity to perform that duty. We cannot say that his action in setting aside the default decree was an abuse of discretion. The order appealed from is affirmed.

NUESSLE, Ch. J., and BRODERICK, District Judge, concur.

BURR, J., did not participate.

CHRISTIANSON, J. (dissenting). I agree with the principles stated in paragraphs 1 and 2 of the syllabus, but as I see it those principles have no application in this case. This is not a case where a default judgment was taken through mistake, inadvertence, surprise or excusable neglect on the part of the defendant. It is a case where a defendant who consented to and colluded in the procurement of a judgment and who accepted benefits thereunder moves the court to vacate such judgment.

On July 1, 1947, the plaintiff brought this action for divorce against the defendant. On July 5, 1947, the summons and com-

plaint in the action were served on the defendant personally by the chief of police of Finley, North Dakota. On July 14, 1947, the plaintiff and defendant entered into a written agreement entitled in the action, and reading as follows:

"WHEREAS, a divorce action is pending between the parties; and

"WHEREAS, it is desired to settle matters of custody, property settlement, alimony, and financial matters.

"IT IS THEREFORE HEREBY STIPULATED AND AGREED, that should a divorce be granted herein the decree shall provide as follows:

1.

"That the Defendant shall have the custody of the minor children of the parties, subject to the right of the Plaintiff to visit with the children at reasonable times and places.

2.

"That the Defendant shall have the house of the parties at Finley, North Dakota, and the furniture and personal property therein, excepting alone the Plaintiff's personal paraphernalia, and it is understood that the Plaintiff shall keep up the payments on the mortgage until it is fully paid, and the Plaintiff shall by a good and valid deed convey this property to the Defendant as shall be required by the decree.

3.

"That the Plaintiff shall pay to the Defendant, until the further order of the court in the premises, as and for alimony and support money, 1/3 of his monthly earnings, not exceeding the amount of $100.00 in any one month, and for this purpose shall render a statement of his earnings to the Defendant at periodical intervals.

4.

"That the Plaintiff and Defendant except as herein provided shall each own what assets he or she may now have or hereafter acquire free and clear from any claim on the part of the other on account of anything growing out of their marriage; and except as herein provided neither shall be responsible for any

money payment to the other for alimony, support money, counsel fees, suit money, costs, or anything growing out of their marriage and hereafter neither shall purchase anything on the credit of the other, and each shall pay such obligations as he or she may hereafter acquire."

Upon the hearing of the application to vacate the judgment the defendant testified that she read the agreement and signed it. She stated, "But let me explain that. I didn't want to sign it unless he possibly could give me more than one-third of his earnings. But he said he had so many bills to pay that he couldn't do that. I halfways realized at that time if things kept on that way I couldn't make it on that."

The defendant made no appearance in the action. The case was brought on for hearing before the court on August 12, 1947. Plaintiff appeared in person and with his counsel. Proof was submitted of the service of the summons and complaint upon the defendant and of her failure to answer. Evidence was adduced. The plaintiff and another witness were sworn and testified. At such hearing the agreement between the parties above set forth was marked as an exhibit and offered and received in evidence. Thereafter the court made its findings of fact in favor of the plaintiff and ordered judgment to be rendered in his favor. In its findings of fact the court found "that the parties hereto have entered into an agreement as to the property settlement, custody, alimony and support money which the court recognizes and adopts as a part of these findings." Judgment was rendered and entered on August 12, 1947. Such judgment awarded the plaintiff an absolute divorce and made provision for the custody of the children, for the transfer to the defendant of the house and personal property in accordance with the provisions of the agreement and also for the payment to the defendant until the further order of the court as and for alimony and support money of one-third of plaintiff's monthly earnings not exceeding the amount of $100 in any one month and required the plaintiff to render to the defendant a statement of his earnings at periodical intervals.

The attorney for the plaintiff mailed a copy of the judgment to the plaintiff and directed him to deliver such copy to the de-

fendant, and the defendant testified that the plaintiff did deliver to her a copy of the judgment about the middle of August 1947. She testified that she read the judgment and that it contained the provisions that she expected would be in it but "he didn't make it very clear about the house. I had to pay some taxes on that." She further testified that she talked with one Meldahl, an attorney at Finley, where she was residing, about the deed to the house. Apparently she also contacted the bank at Finley with respect to the mortgage on the house for she testified, "the bank in Finley told me the house in Finley was clear enough. They kept the rest of the stuff on the mortgage instead." She further testified:

"Q. It became necessary for Mr. Miller to sell his truck to clear that up; isn't that true?

A. He cleared up himself. He didn't give me any money.

Q. He sold his truck and paid them off himself?

A. Yes."

The plaintiff testified—(and this is not controverted)—that the defendant called him a few times about the deed to the house and that he stated he was going to take care of it as soon as he could; that thereafter he received a letter from defendant's attorney Meldahl that the defendant wanted the deed. Meldahl required that plaintiff's then wife, the former Ruth Hagen, join in the execution of the deed and accordingly the deed for the house was executed and acknowledged by the plaintiff and his then wife, the former Ruth Hagen, as husband and wife and delivered to the defendant. The defendant testified that later she sold the house to her mother and received $1400 in payment, and also the privilege of continuing to live in the house.

On April 14, 1948, the defendant moved the court that the judgment be set aside, defendant relieved of her default and permitted to interpose an answer. In the affidavit of the defendant submitted as a basis for the application to vacate it is said:

"that she is the defendant in the above action and that a default decree of divorce in said action was entered against her on or about August 12, 1947, through her mistake and inad-

vertence; that affiant was informed by Myron Miller, her husband, that one Ruth Hagen was pregnant by him, Myron Miller, and affiant was assured and promised by plaintiff above, Myron Miller, that if she would not contest a divorce action to be brought by him that he would remarry affiant after marrying and divorcing the said Ruth Hagen; that Myron Miller well knew that he had no grounds for divorce from affiant, and that affiant made no appearance in said divorce action solely because she believed in and relied on Myron Miller's promise to divorce Ruth Hagen and remarry her; that Myron Miller assured and promised affiant that his only reason for desiring to divorce her and marry Ruth Hagen was to legitimatize the child concerned; that said assurance and promises are what induced affiant to make no appearance in said divorce action and to not consult any lawyer about her right; that Myron Miller's complaint in said action alleges, among other things, that there were three children born of the marriage, whereas the fact is that Myron Miller and affiant had four children and affiant was pregnant with her fifth child of said marriage at the time said action was commenced, said child having been born shortly after said divorce decree was entered; that said pregnancy of affiant was concealed from the court, as was the fact that Myron Miller and affiant had four children, . . . . that Myron Miller and Ruth Hagen were married at Detroit Lakes, Minnesota, on or about August 21st, 1947, and a child was born to them on or about November 21st, 1947, which said child died a day or so thereafter; . . . ."

It will be noted that nothing is said in defendant's affidavit or application to vacate the judgment with respect to any statement on the part of the plaintiff that the woman who had become pregnant as a result of relations with him was a minor and that unless plaintiff could obtain a divorce from the defendant "he would have to go to the pen." In such affidavit it is stated "that his only reason for desiring to divorce her (defendant) and marry Ruth Hagen was to legitimatize the child concerned." If the plaintiff made the statements later attributed to him to the effect that the girl for whose pregnancy he was responsible was a minor and that he "would have to go to the pen" unless he could and did marry the girl, it is rather strange that they were

overlooked in the original or moving affidavit especially in view of the importance that is later attached to this alleged statement. The plaintiff denied that he made any such statements. There is no evidence as to the age of Ruth Hagen other than the statement of the defendant that "her (Ruth Hagen's) mother said she was 20 last October."

In response to questions asked by her counsel on direct examination the defendant testified:

"I didn't hire a lawyer because Myron came to me and told me that he had a minor girl in trouble and if he couldn't marry her he would have to go to the pen. And he said she did not know he was married and because of the children I did not want them to have their father called a jail bird. They were going to school and I didn't want them to have a jailbird for a father. And after he promised me that he would divorce her after their child was born and come back to me and the family where he belonged I thought it would be the best way.

Q. Did I understand you to say that you did not appear in this action because of a promise Myron Miller made to you that after he had married this other girl he would divorce her and come back and remarry you?

A. Yes. . . . .

Q. You have stated that your husband, Myron Miller, and this woman were married sometime after this divorce decree was entered?

A. Yes. A week or two weeks afterwards.

Q. You made an investigation to determine that?

A. Yes.

Q. Do you know whether or not a child was born to them?

A. Yes.

Q. When was that child born?

A. It was born a week before Thanksgiving—last November.

Q. And, as I understand it, the child did not live very long?

A. No, it did not.

Q. Just a matter of days?

A. It was in the Sunday Forum after Thanksgiving there that the Miller baby had died. . . . .

Q. Have you asked him to come back—to divorce his present wife and remarry you?

A. Yes, I have. Several times. . . . ."

On cross-examination defendant testified:

"Q. You expected him to get a divorce, did you not?

A. Yes. On the basis that he would come back.

Q. But you knew and expected the divorce would go through?

A. Yes. I expected it to go through on default. . . . .

Q. According to what you have told us you say Mr. Miller agreed and you agreed that he was to get a divorce; is that right?

A. Yes.

Q. Because of this trouble. And he was to get married to this other woman?

A. Yes. He said if he didn't have to marry her he—

Q. But it was contemplated he was going to marry her?

A. Yes. To keep him from going to the pen. Because he said she would railroad him otherwise. . . . .

Q. Is it money you are looking for or do you want to take him away from this other woman?

A. I want to take him away from her because I found out who she was. Because she knew we were married and I don't think I should have to give up everything while she is going around town all dressed up, and the children have to go in rags so to speak. As long as she is in the picture there will be nothing for the children.

Q. Have you asked him to divorce her?

A. Yes.

Q. When was that?

A. After the child was born last fall.

Q. It was about two weeks before Christmas that their child died?

A. No, it was in the Sunday Forum on the Sunday before Thanksgiving. Whatever date that was. . . . .

Q. Did you give Mr. Miller any receipts for this $48 you say he gave you?

A. No, he didn't ask for any.

Q. Did he pay you by check or cash?

A. By cash.
Q. Did he hand it to you?
A. Yes. . . . .
Q. How many times would you say he gave you money?
A. That I couldn't swear to.
Q. Give us your best judgment.
A. Seven or eight times, roughly speaking."

Upon this conclusion of the testimony given by the defendant on her direct examination and on cross-examination, the trial judge propounded to her, among others, the following questions:—

"Q. I would like to ask a question or two at this time. Mrs. Miller, in your letters to me you mentioned something to the effect that Mr. Miller told you that unless you would let him have a divorce he would be sent to the penitentiary because of have gotten Miss Hagen in a family way.
A. Yes, he did say that. . . . .
Q. You also testified that he told you that if you would let him have a divorce and give him an opportunity to marry this other woman that after his marriage to her he would get a divorce from her and remarry you. Is that true?
A. Yes. He said he would after the child was born."

In the affidavit of the defendant for vacation of the judgment reference is made to the fact that no mention is made in the complaint of the pregnancy of the defendant, and that the complaint states that three children had been born to the parties during their marriage, whereas, in fact, four children had been born; and it is asserted that the failure to call attention to the fact of defendant's pregnancy, and the further fact that the complaint stated that three children had been born to the parties, when in fact there were four children, constituted a fraud both upon the defendant and upon the court. With respect to the omission from the complaint of reference to the first child born to the parties the plaintiff testified that this was done because throughout the years it had been represented to people generally at the insistence of the defendant that this child was not the child

of the plaintiff and defendant but was an adopted child. In this he was corroborated by the defendant herself. She testified that the representation that the child was adopted had been made "because of my father. He said we couldn't keep that child otherwise and we had to live at home there. Q. Mr. Miller is correct then when he states that the child was presumed adopted and you wanted it kept that way? A. It was because of my father I did it. . . . Q. This oldest child—your father didn't know at the time of the divorce that that was your child? A. He probably did. My mother does. He knew all about this mess of mine too before I did. So he very likely knew the other too. Q. You wouldn't deny you had stated you had taken the child out of a home or something like that? A. I didn't say that. Q. What did you say? A. I said it was someone elses, and that we had taken it. . . . ."

The defendant in her testimony admitted that she read the complaint, also that she received and retained a copy of the judgment; that she read the judgment, and that she was fully aware of the fact that the complaint made no reference to her pregnancy and aware of the fact that the complaint stated that the parties had three children. It appears from her testimony that on examination of the judgment she became concerned about the provision relating to the transfer to her of the house and that she took the judgment to an attorney and consulted him with respect thereto and with respect to obtaining performance by the plaintiff of the provisions of the judgment awarding her title to the house. It appears from her testimony that at the time she consulted such attorney she had full knowledge of the omissions in the complaint of which she complains now. Whether she called these matters to the attention of the attorney at that time does not appear, but apparently she was not concerned with these omissions and did not discuss them with her attorney. It is difficult to see how the failure to allege that the defendant was pregnant, or the fact that the complaint alleged there were three minor children when, in fact, there were four could have had any controlling effect upon whether the plaintiff had established by the evidence the grounds of divorce that were alleged in the complaint. I was not aware that wheth-

er a defendant in an action for divorce is or is not pregnant is a material fact which must be alleged in the complaint or that the question whether there are three minor children or four minor children is a fact which is determinative of whether the cause of action for divorce has been established. The question of the pregnancy of the defendant and the needs of the children and the provision to be made for their support are matters properly for consideration by the court in determining the allowance for alimony, support, suit moneys, etc., but they have no bearing on whether the plaintiff has or has not established a cause of action for divorce.

The first question that arose and was required to be determined by the trial court on the hearing of the action for divorce was whether the plaintiff had established the grounds for divorce that were alleged in the complaint. Whether the defendant was or was not pregnant or whether there were only three minor children or were four minor children could not affect the question whether the plaintiff had established the grounds for divorce which he had alleged and introduced evidence to establish. "Divorce cannot be refused upon proven statutory grounds because children may be involved." Henley v. Foster, 220 Ala 420, 125 So 662. See, also, 2 Schouler, Domestic Relations 6th ed § 1147; Baugh v. Baugh, 37 Mich 59, 26 Am Rep 495.

The children were not, and could not properly have been made, parties to the action for divorce. Henley v. Foster (Ala) supra; Baugh v. Baugh (Mich) supra; Kosen v. Kosen (App) 42 NE2d 778, 36 Ohio L Abs 156. The plaintiff has not been divorced from his children and the judgment for divorce did not terminate the obligations and duties which he owed to them. Barker v. Barker, 75 ND 253, 27 NW2d 576, 171 ALR 447; ND Rev Code 1943, § 14–0715.

"The child . . . is not to be deprived of its natural and legal right of protection and support by its father, because of any family quarrel or of any agreement between husband and wife. It is not a party to divorce proceedings. It is not barred as to its rights by any decree therein." McAllen v. McAllen, 97 Minn 76, 106 NW 100.

In this state the provisions of a decree of divorce relating to

the maintenance of minor children remain subject to modification by the court from time to time. ND Rev Code 1943, § 14-0524. The decree entered in this case expressly recognized that it was subject to such modification, and that the provision therein relating to payment of alimony and support moneys continued in force only "until the further order of the court in the premises." The power of the trial court to make provision for the minor children remains in full force and effect and was not affected by the provisions in the judgment.

The testimony of the defendant establishes that the judgment in this case was not taken against her through her mistake, inadvertence, surprise or excusable neglect. According to her testimony she and her husband entered into an agreement to the effect that she would not contest the action for divorce to be brought by him and that he would be permitted to obtain a judgment of divorce in such action by default; that following the rendition of the judgment of divorce he would marry the girl for whose pregnancy he was responsible so that the child that had been begotten by him would become legitimate, and that the plaintiff might avoid being convicted of and imprisoned for crime; that after the child had been born he would obtain a divorce and remarry the defendant. The defendant read the complaint and knew the charges that were set forth in the complaint. After the summons and complaint had been served upon her she entered into a written agreement with the plaintiff by the terms of which she was to be awarded the custody of the children and also awarded certain property and alimony. She read the agreement and signed it. She did not complain then and does not contend now that the written agreement did not fairly state the understanding between them. After the judgment had been rendered she received a copy thereof and the only concern she then had was as to the provisions in the judgment relating to the transfer of the house and with respect to this she then consulted Meldahl, a reputable and competent attorney in the city where the defendant and her parents were then living. Such attorney later communicated with the plaintiff concerning the deed for the house and thereafter the plaintiff and his then wife executed and delivered a deed conveying the

house to the defendant. The defendant received and accepted such deed and later sold the property to her mother and received $1400 therefor, and the privilege of continuing to live in the house.

Hence, according to defendant's testimony she aided the plaintiff in procuring the judgment of divorce, and connived at and acquiesced in his subsequent marriage (Loud v. Loud, 129 Mass 14, 18, 19; Chapman v. Chapman, 224 Mass 427, 113 NE 359, LRA1916F 528; Langewald v. Langewald, 234 Mass 269, 125 NE 566, 39 ALR 674; Bidwell v. Bidwell, 139 NC 402, 52 SE 55, 2 LRA NS 324, 111 Am St Rep 797), and accepted substantial benefits under the judgment. The real complaint of the defendant,—and of this her testimony leaves no doubt,— is that the plaintiff has failed and refuses to carry out the agreement which she claims was made that after the child was born he would obtain a divorce from the woman he married after the judgment of divorce in this case was rendered and remarry the defendant. There is no claim that the defendant was subjected to any threats or force. In her affidavit or application to vacate the judgment she states that the only reason assigned by the plaintiff for desiring the proposed divorce was so that he might marry the girl for whose pregnancy he was responsible and thus legitimatize the child which he had begotten. Upon the hearing she added to this that the plaintiff had told her that unless he could marry this girl he would have to go to the pen. At the time these negotiations between the parties took place and during the pendency of the action the defendant was living in Finley—a small city of less than 1,000 inhabitants,—the county seat of the county. Her parents were living there. In order to obtain title to the real property which had been awarded to her under the judgment she consulted a local attorney, who took such action as was necessary to obtain for her the title to such property. There is nothing to show that Ruth Hagen participated in the arrangement between the plaintiff and defendant, or that she had any knowledge of the agreement between them, and she is not a party to this proceeding.

The weight of authority and the holdings of this court are

to the effect that under the facts and circumstances disclosed in this case and established by the defendant's own testimony she is precluded from attacking the judgment or applying for a vacation thereof.

It is a general rule approved by the great weight of authority including the decisions of this court that a party who knowingly accepts a substantial benefit under a judgment is precluded from afterward assailing the correctness or validity thereof. It is held that such acceptance operates as a waiver or release of errors and irregularities, and estops the party who accepts the benefit from afterward moving to vacate the judgment, (34 CJ pp 362, 363; 4 CJS p 414; 49 CJS p 512; 1 Freeman, Judgments 5th ed § 265, pp 529, 530; 2 Cal Jur p 229, § 64; People v. Raquette Falls Land Co., 100 Misc 601, 603, 166 NYS 464; Freiberg v. Le Clair, 78 Wis 164, 47 NW 178; Whitney v. Chesbro, 244 App Div 594, 280 NYS 138; Cratin v. Cratin, 178 Miss 881, 173 So 415, 174 So 255, 256; Newcomer v. Newcomer, 199 Iowa 290, 201 NW 579; Reppert v. Reppert, 214 Iowa 17, 241 NW 487; Stehli v. Thompson, 151 Fla 566, 10 So2d 123; Deering Harvester Co. v. Donovan, 82 Minn 162, 84 NW 745, 83 Am St Rep 417; McKain v. Mullen, 65 W Va 558, 64 SE 829, 29 LRA NS 1); moving for a new trial (Storke v. Storke, 132 Cal 349, 64 P 578; Boyle v. Boyle, 19 ND 522, 525, 126 NW 229, 230, 231); or maintaining an appeal or proceeding in error to review the judgment (2 Am Jur 521, Appeal and Error §§ 957 et seq.; 4 CJS 414 et seq.; Tyler v. Shea, 4 ND 377, 61 NW 468, 50 Am St Rep 660; Williams v. Williams, 6 ND 269, 69 NW 47; Tuttle v. Tuttle, 19 ND 748, 124 NW 429; Easton v. Lockhart, 62 ND 767, 89 NW 75; Larabee v. Larabee, 128 Neb 560, 259 NW 520; Gerbig v. Gerbig, 60 Nev 292, 108 P2d 317).

"The general rule that a party by voluntarily accepting the benefits of a judgment or decree waives his right to have it reviewed on appeal or error proceedings, applies to appeals in divorce cases. . . . And it is held, where a divorce is granted against the wife to whom an award of alimony is made, that, by accepting the alimony, she is precluded from tak-

ing and prosecuting an appeal from the decree of divorce." 2 Am Jur 1014, Appeal and Error § 66.

This rule was applied by this court in divorce cases in Williams v. Williams, 6 ND 269, 69 NW 47, supra; Tuttle v. Tuttle, 19 ND 748, 124 NW 429, supra; and Boyle v. Boyle, 19 ND 522, 126 NW 229, supra.

In California Jurisprudence (1 Cal Jur p 1014, § 66) it is said: "If the wife receives the benefit of the alimony provision of a decree rendered in a divorce action, she must also take the burden of such decree and she is, therefore, deemed to waive all right of appeal therefrom. This is in accordance with the general principle that where the different provisions of a judgment are so connected that a part cannot be reversed without a reversal of the whole, a party is not permitted to enforce the provisions of the judgment in his or her favor and appeal from the adverse portions thereof. Likewise, where the wife accepts alimony awarded by the decree of divorce granted to her husband she thereby waives her right to move for a new trial of the action."

It is a "well settled principle, that, in a court of justice, a man cannot complain of a wrong done by himself, or of another's wrong in which he was a partaker." Dow v. Blake, 148 Ill 76, 88, 89, 39 Am St Rep 156, 164.

"It was said in an early English case (Prudan v. Phillips, reported in Hargrave's Law Tracts 456) that 'if both parties colluded in the cheat upon the court, it was never known that either of them could vacate the judgment.' This statement has frequently been quoted with approval in the courts of this country, and the principle embodied therein has very generally been accepted and applied." 9 RCL p 451, § 260.

Freeman says that "where parties to an action collusively procure a judgment or decree, as in a divorce case, neither may thereafter have it vacated on that ground, since he is estopped by his own misconduct." 1 Freeman, Judgments (5th ed p 464, § 234.

In his work on Marriage, Divorce, and Separation, Bishop says: "Mutual fraud of which the common instance is collusion, and which is available to third persons in interest, as

we shall see in the next sub-title, cannot be brought forward by either of the parties against the other as ground for reversing any step in the cause or vacating the sentence. This doctrine is an inevitable result from the universal rule of our law that one in a court of justice cannot complain of his own wrong, or of another's wrong whereof he was a partaker. It would be a special novelty for a plaintiff to address the tribunal with, 'The defendant and I have been playing a trick on this court, but I discover that he has got the better of me, so please turn the tables on him.'" 2 Bishop, Marriage, Divorce and Separation § 1548, p 588.

In Nelson on Divorce and Separation it is said: "Where the parties have obtained a decree of divorce by entering into an agreement to suppress evidence, or to not interpose a defense, or by other collusive agreements, they will be bound by the decree, and the wife cannot plead her own collusion as a fraud upon the court in order to have the decree vacated and additional alimony granted to her.

"Although such decree is a fraud upon the court, and therefore against public policy, in some cases the decree will not be disturbed, because it would be much more against public policy to relieve parties who are in pari delicto, or to allow the wife to profit by her collusion. A decree will not be vacated where the wife agrees to permit the husband to procure a divorce on the ground of her adultery, in consideration that the husband pay her a sum of money and convey to her certain real property, which he refuses to do after obtaining the divorce." 2 Nelson, Divorce and Separation § 1055, pp 1015–1016.

Schouler in his work on Marriage, Divorce, Separation and Domestic Relations says: "One who has obtained a decree of divorce cannot by direct petition have it vacated on the ground that it was obtained by a collusive arrangement, especially where there is no allegation that the attorneys in the case or the court failed to do their duty. And as a general rule courts of equity will not interfere to relieve a party to an action from a judgment which has been procured through a collusive agreement between the parties to the action, to the effect that either of said parties shall commence the action and obtain by the connivance or con-

sent of the other a judgment to which he would not otherwise be entitled. Hence equity will not set aside a judgment obtained in a divorce case where the plaintiff agreed to consent to the divorce and not contest the same, although the defendant did not carry out his part of the bargain by making certain provisions regarding the custody of the two children. Courts of equity will not interfere with judgments in divorce proceedings obtained solely through the collusive connivance of the parties to the proceeding." 2 Schouler, Marriage, Divorce, Separation and Domestic Relations 6th ed pp 1932, 1933, § 1744.

While there is some conflict in the authorities, and there are decisions holding that a collusive decree of divorce may be vacated upon the application of one of the parties, the rule stated above is in accord with the holding of this court, and with the weight of authority. Henderson v. Henderson, 32 ND 520, 156 NW 245; 17 Am Jur 381; 9 RCL p 451; Simons v. Simons, 47 Mich 253, 10 NW 360; Carlisle v. Carlisle, 96 Mich 128, 55 NW 673; Robson v. Kramer, 215 Iowa 973, 245 NW 341; Henley v. Foster, 220 Ala 420, 125 So 662, supra; Hendricks v. Hendricks, 216 Cal 321, 14 P2d 83; Newcomer v. Newcomer, 190 Iowa 290, 201 NW 579, supra; Paffen v. Paffen, 94 NJ Eq 356, 120 A 197; Hall v. Hall, 93 Fla 709, 112 So 622; Crane v. Deacon (Mo) 253 SW 1068; Karren v. Karren, 25 Utah 87, 69 P 465, 60 LRA 294, 95 Am St Rep 815; Robinson v. Robinson, 77 Wash 663, 138 P 288, 51 LRA NS 534; 9 Cal Jur pp 749–750; 2 Schouler, Mariage, Divorce, Separation, and Domestic Relations 6th ed p 1932, § 1744.

In American Jurisprudence (17 Am Jur 381, Divorce and Separation § 466) it is said: "According to the weight of authority when the spouses through collusion or consent prevail upon the court to take jurisdiction of a divorce suit and render a decree therein, both are precluded from having that decree set aside or attacking its validity because of such collusion or consent, especially where the decree has been acquiesced in for a considerable period of time or where the opposing party has remarried and children have been born of the second marriage."

In Henderson v. Henderson, 32 ND 520, 156 NW 245, supra,

as in this case the husband and wife entered into an arrangement whereby it was agreed that a divorce should be procured. In that case the husband represented to his wife that a former wife was causing him trouble and that he had been arrested upon a charge of embezzlement and that she, his wife, would not be permitted to testify in his behalf in such criminal action; and the husband urged that the wife obtain a divorce from him so that he might avoid a possible charge of bigamy by his first wife and also so that his then wife might testify as a witness in his behalf upon the trial of the criminal action. The husband agreed and assured her that if she would secure the divorce and aid him in meeting the criminal charges successfully he would then remarry her. The wife in the Henderson Case asserted that it was in reliance upon such representations and promises by her husband and not through any desire for divorce that she instituted the action for divorce and obtained judgment therein. After the decree of divorce had been rendered the husband married a woman other than his former wife and such former wife thereupon made application to have the decree of divorce vacated. The trial court granted the application, and vacated the judgment. The defendant appealed, and this court reversed the order vacating the judgment, and held that under the circumstances shown the plaintiff had "no standing in a court of equity," and that her application should have been denied. In the Henderson Case as in this case it was the husband who proposed that there be a divorce. In the Henderson Case as in this case the husband gave as reasons for the proposed divorce that it would be of assistance or benefit to him in actions where he had been or might be charged with commission of crime. In the Henderson Case as in this case the husband promised that he would remarry the wife. However, in the Henderson Case there was no agreement such as the defendant claims there was in this case that after the judgment of divorce had been rendered the husband should marry some other woman and later divorce her and then remarry the wife who had colluded with him in obtaining the judgment of divorce. In the Henderson Case the wife did not connive at and acquiesce in the sub-

sequent marriage of the husband to another woman. In the Henderson Case there had been no acceptance of benefits under the judgment.

The Henderson Case was decided by this court more than thirty years ago and the correctness of the rule announced therein has never been challenged in this court nor have the lawmakers made any attempt to change it.

The rule that acceptance of substantial benefits under a decree of divorce estops the party who accepts such benefits from maintaining proceedings to reverse the judgment was first declared by this court more than fifty years ago and has been reaffirmed in many subsequent cases.

Burke, J., concurs.