BANK OF BEULAH, Beulah, North Dakota, a banking corporation, Plaintiff-Appellee,

v.

Monroe CHASE, Defendant,

Dakota National Bank of Bismarck, Bismarck, North Dakota, a banking corporation, Defendant and Appellant.

Civ. No. 9066.

Supreme Court of North Dakota.

June 23, 1975.

Alfred C. Schultz, Sperry & Schultz, Bismarck, for plaintiff-appellee.

Robert O. Wefald, Wheeler, Wolf, Wefald & Durick, Bismarck, for defendant-appellant.

PAULSON, Acting Chief Justice.

The Bank of Beulah, Beulah, North Dakota, commenced a claim and delivery action against Monroe Chase and Dakota National Bank of Bismarck, Bismarck, North Dakota [now known as the Dakota Northwestern Bank], to recover possession of a motor vehicle. The Dakota National Bank interposed an answer and counterclaim against the Bank of Beulah for delivery of title to the motor vehicle and cross-claimed against Monroe Chase. The Bank of Beulah replied to the counterclaim; Monroe Chase defaulted in district court.

The trial was held in the District Court of Burleigh County and judgment was entered on November 8, 1974, in favor of the Bank of Beulah against the defendants. Dakota National Bank has appealed. Monroe Chase has not perfected an appeal. The parties to this appeal stipulated to the following facts:

"(1) The plaintiff is a banking institution, with its place of business at Beulah, North Dakota.

"(2) That the defendant, the Dakota National Bank and Trust Company is a banking institution, with its place of business in Bismarck, North Dakota, the name of this bank now being the Dakota Northwestern Bank.

"(3) That both of the foregoing banks are engaged in the general banking business, and are duly organized and existing for that purpose, under the laws, regulations and rules relating thereto.

"(4) That on or about the 27th day of October, 1971, the defendant, Monroe Chase, purchased under a retail installment contract, and security agreement, from Spier Sales & Service, a licensed Ford dealer at Beulah, North Dakota, owned and operated by one H. D. Spier, Jr., for the purchase of one Ford F100 ½ ton Ranger XLT eight cylinder truck, a 1972 model, with title number 1858374 (or 1658374), serial no. FLOYLM45585, a copy of which contract is attached hereto and made a part hereof. That Monroe Chase was operating under a dealer's license at the time.

"(5) That thereafter and on said 27th day of October, 1971, the said contract was assigned to the Bank of Beulah, the plaintiff, and that a financing statement was filed thereon, in the office of the Register of Deeds for Burleigh County, North Dakota, on the 28th day of October, 1971, which described said property, and which filing no. is 164487, this having been the resident county of the purchaser, Monroe Chase.

"(6) That Monroe Chase was provided with a certificate of origin of the truck, and through which he obtained a certificate of title, sent to the Bank of Beulah, but which was not done until December 29th, 1972, over one year after he bought the vehicle. The Bank of Beulah still holds the certificate, showing it to be a lienholder.

"(7) That the said Monroe Chase immediately took possession of said vehicle, and without a 1971 set of license plates, entered into a contract for the sale thereof, with one Gordon L. Hager, this contract for the sale by Monroe Chase being made a part of this stipulation, to show the execution thereof. That Chase, or one of his agents, attached a set of license plates to said truck, for this sale, assigned for a different vehicle.

"(8) That the certificate of title is also attached to this stipulation, to show the date and the owner, with the name of the lienholder, this plaintiff.

"(9) That the sale made by Monroe Chase was on the sale, by the attached contract, showing a sale price of $3,146.67, and a trade-in, without any allowance having been shown therefor; that all of the payments to be made by Mr. Hager were to be paid according to the contract starting in April, 1972, and continuing into December, 1973.

"(10) The Hager contract was assigned by Monroe Chase, the owner of the Midway Motor Sales, to the defendant, the

Dakota National Bank, which paid the amount thereof to Monroe Chase, on December 20th, 1971.

"(11) That the Dakota National Bank did not check the record, showing the filing of the financing statement, by the Bank of Beulah.

"(12) That Mr. Hager, the buyer from Mr. Chase, made no payments on the truck, and it was re-possessed in August of 1972, after which he became deceased.

"(13) That the value of the truck, involved in this litigation, was the sum of $3700.00 at the time that it was re-possessed by the Dakota Northwestern Bank, which filed a re-delivery bond, in the action, and since which time the Dakota National Bank has kept the truck in storage."

Upon these facts, the trial court concluded that the Bank of Beulah had perfected its lien and, therefore, had a valid and existing first lien on the vehicle sold to Chase. The trial court stated that in determining priority of liens, the motor vehicle title registration statutes contained in Chapter 39–05, N.D.C.C., take precedence over the general provisions of the Uniform Commercial Code contained in Title 41, N.D.C.C.

Counsel for Dakota National Bank contend on appeal that certain provisions of the U.C.C. are determinative of this action, and that, under the U.C.C., Dakota National Bank is entitled to the proceeds of the motor vehicle in question. Counsel for the Bank of Beulah strenuously urge support of the trial court's determination and further argue that, even if the provisions of the U.C.C. are said to apply to this case, the Bank of Beulah is entitled to priority because it has perfected its security interest by filing a U.C.C.–1 financing statement.

█ We hold, initially, that the provisions of the U.C.C. and not the provisions of our title registration laws for motor vehicles govern the case before us. Subsequent to the issuance of the trial court's memo-

randum opinion, this court decided the case of Ramsey National Bank & Trust Company v. Suburban Sales & Service, Inc., 231 N.W.2d 732 (N.D.1975). In *Ramsey*, one of the issues before us was whether the Ramsey Bank had perfected its security interest in an automobile it had floor-planned for Suburban Sales & Service. In determining whether the security interest was to be perfected under the motor vehicle title registration laws or under the U.C.C., we stated, in *Ramsey, supra*, 231 N.W.2d at 737:

"Initially, we do not believe that an automobile dealer's inventory of automobiles is property covered by our title registration statutes. By the terms of § 39–05–05, N.D.C.C., application for a certificate of title for a new automobile is not to be made until the automobile is purchased by a consumer from a dealer. Except as required by § 39–22–09, N.D.C.C., dealers in used motor vehicles are not required to, although they may, obtain certificates of title assigned to them for used cars that come into their possession. [Section 39–05–27, N.D.C.C.] Because of this, it is our interpretation of the law that § 41–09–23, N.D.C.C., is intended to apply to automobiles held as inventory by motor vehicle dealers. This interpretation comports with the general interpretation of § 9–302 of the Uniform Commercial Code [§ 41–09–23, N.D.C.C. (footnote omitted)]. In Anderson, Uniform Commercial Code § 9–302:21 (2d ed. 1971), it is stated:

" 'The motor vehicle code, in its provision for the notation of an encumbrance on the title certificate, does not control the manner of perfecting a security interest by a creditor advancing money for the wholesale financing of new cars. If the state motor vehicle law does not require that a dealer in used cars obtain a title certificate for them, the obtaining of the certificate noting the secured party's interest is not necessary to perfect that security interest.' "

Thus, we clearly indicated in *Ramsey*, although we did not hold, that security in-

terests in an automobile inventory are governed by the U.C.C., and not by our title registration laws. We reaffirm those principles enunciated in *Ramsey* and we adopt the rationale set forth therein. Implicit in this decision is our conclusion that Monroe Chase was a motor vehicle dealer and that, by the terms of the Chase-Bank of Beulah contract, the parties intended the motor vehicle which was purchased by Chase to be resold.

The following provisions of the U.C.C. are determinative of this case [§§ 41–09–27, 41–09–28, and 41–09–29, N.D.C.C.]:

*41–09–27.* *(9–306)* " 'Proceeds'—Secured party's rights on disposition of collateral.*—1. 'Proceeds' includes whatever is received when collateral or proceeds is sold, exchanged, collected or otherwise disposed of. The term also includes the account arising when the right to payment is earned under a contract right. Money, checks and the like are 'cash proceeds'. All other proceeds are 'noncash proceeds'.

"2. Except where this chapter otherwise provides, a security interest continues in collateral notwithstanding sale, exchange or other disposition thereof by the debtor unless his action was authorized by the secured party in the security agreement or otherwise, and also continues in any identifiable proceeds including collections received by the debtor.

"3. The security interest in proceeds is a continuously perfected security interest if the interest in the original collateral was perfected but it ceases to be a perfected security interest and becomes unperfected ten days after receipt of the proceeds by the debtor unless

"a.  a filed financing statement covering the original collateral also covers proceeds; or

"b.  the security interest in the proceeds is perfected before the expiration of the ten-day period.

"4. In the event of insolvency proceedings instituted by or against a debtor, a secured party with a perfected security interest in proceeds has a perfected security interest

"a.  in identifiable noncash proceeds;

"b.  in identifiable cash proceeds in the form of money which is not commingled with other money or deposited in a bank account prior to the insolvency proceedings;

"c.  in identifiable cash proceeds in the form of checks and the like which are not deposited in a bank account prior to the insolvency proceedings; and

"d.  in all cash and bank accounts of the debtor, if other cash proceeds have been commingled or deposited in a bank account, but the perfected security interest under this paragraph d is

"(1) subject to any right of setoff; and

"(2) limited to an amount not greater than the amount of any cash proceeds received by the debtor within ten days before the institution of the insolvency proceedings and commingled or deposited in a bank account prior to the insolvency proceedings less the amount of cash proceeds received by the debtor and paid over to the secured party during the ten-day period.

"5. If a sale of goods results in an account or chattel paper which is transferred by the seller to a secured party, and if the goods are returned to or are repossessed by the seller or the secured party, the following rules determine priorities:

"a.  If the goods were collateral at the time of sale for an indebtedness of the seller which is still unpaid, the original security interest attaches again to the goods and continues as a perfected security interest if it was perfected at the time when

the goods were sold. If the security interest was originally perfected by a filing which is still effective, nothing further is required to continue the perfected status; in any other case, the secured party must take possession of the returned or repossessed goods or must file.

"b. An unpaid transferee of the chattel paper has a security interest in the goods against the transferor. Such security interest is prior to a security interest asserted under paragraph a to the extent that the transferee of the chattel paper was entitled to priority under section 41–09–29 [§ 9–308, U.C.C.].

"c. An unpaid transferee of the account has a security interest in the goods against the transferor. Such security interest is subordinate to a security interest asserted under paragraph a.

"d. A security interest of an unpaid transferee asserted under paragraphs b or c must be perfected for protection against creditors of the transferor and purchasers of the returned or repossessed goods."

*41–09–28. (9–307) "Protection of buyers of goods.*—1. A buyer in ordinary course of business (subsection 9 of section 41–01–11 [§ 1–201; U.C.C.]) other than a person buying farm products from a person engaged in farming operations takes free of a security interest created by his seller even though the security interest is perfected and even though the buyer knows of its existence.

"2. In the case of consumer goods and in the case of farm equipment having an original purchase price not in excess of two thousand five hundred dollars (other than fixtures, see section 41–09–34 [§ 9–313, U.C.C.]), a buyer takes free of a security interest even though perfected if he buys without knowledge of the security interest, for value and for his own personal, family or household purposes or his own farming operations unless prior to the purchase the secured party has filed a financing statement covering such goods."

*41–09–29. (9–308) "Purchase of chattel paper and nonnegotiable instruments.*—A purchaser of chattel paper or a nonnegotiable instrument who gives new value and takes possession of it in the ordinary course of his business and without knowledge that the specific paper or instrument is subject to a security interest has priority over a security interest which is perfected under section 41–09–25 [§ 9–304, U.C.C.] (permissive filing and temporary perfection). A purchaser of chattel paper who gives new value and takes possession of it in the ordinary course of his business has priority over a security interest in chattel paper which is claimed merely as proceeds of inventory subject to a security interest (section 41–09–27 [§ 9–306, U.C.C.]), even though he knows that the specific paper is subject to the security interest."

Paragraph 3 of the 1972 Official Comment to § 9–306, U.C.C. [3 U.L.A.–U.C.C., (Master Ed., 1974 P.P.)] sets forth the intended purposes of these three sections of the U.C.C.:

"3. In most cases when a debtor makes an unauthorized disposition of collateral, the security interest, under prior law and under this Article, continues in the original collateral in the hands of the purchaser or other transferee. That is to say, since the transferee takes subject to the security interest, the secured party may repossess the collateral from him or in an appropriate case maintain an action for conversion. Subsection (2) codifies this rule. The secured party may claim both proceeds and collateral, but may of course have only one satisfaction.

"In many cases a purchaser or other transferee of collateral will take free of a security interest: *in such cases the se-*

*cured party's only right will be to proceeds.* The transferee will take free whenever the disposition was authorized; the authorization may be contained in the security agreement or otherwise given. The right to proceeds, either under the rules of this section [§ 9–306, U.C.C.] or under specific mention thereof in a security agreement or financing statement does not in itself constitute an authorization of sale.

"Section 9–301 states when transferees take free of unperfected security interests. Sections 9–307 on goods, 9–308 on chattel paper and instruments and 9–309 on negotiable instruments, negotiable documents and securities state when purchasers of such collateral take free of a security interest even though perfected and even though the disposition was not authorized." [Emphasis supplied.]

■ Applying this interpretation of the provisions of §§ 9–306, 9–307, and 9–308 [§§ 41–09–27, 41–09–28, and 41–09–29, N.D. C.C.] to the case at bar, it may be seen that the Bank of Beulah has rights only to the proceeds received from Chase's sale of the vehicle if:

1) The Bank of Beulah authorized the sale; or

2) The sale was unauthorized, but came within the purview of § 41–09–28, N.D.C.C. [§ 9–307, U.C.C.].

We believe that the Bank of Beulah did authorize Chase to resell the motor vehicle, although we do not find it necessary to so hold.

The contract and security agreement into which the Bank of Beulah, Chase, and Spier Sales entered contained the notation of "Resale" on its face. It is argued by the Bank of Beulah that the purpose of this notation was to avoid double sales taxation. We find this argument to be unpersuasive. The notation is an express indication that the Bank of Beulah authorized the resale of the vehicle. The facts surrounding the transaction give further indication of the

nature of the contract. At the time of the contract, Chase was validly licensed in North Dakota as a motor vehicle dealer. Upon sale of the vehicle, Spier Sales transferred the certificate of origin to Chase; had this been a sale to an ultimate consumer, Spier Sales would have been required to obtain a certificate of title for the vehicle and deliver such certificate to Chase. Finally, this was but one of six or seven sales made to Chase in his capacity as a motor vehicle dealer.

Even if it were to be argued that the sale of the motor vehicle by Chase was unauthorized, the Bank of Beulah nevertheless would have lost its security interest in the motor vehicle pursuant to the provisions of § 41–09–28, N.D.C.C. [§ 9–307, U.C.C.]. There has been no showing by the Bank of Beulah that Hager knew that the sale to him was in violation of the security interest held by the Bank of Beulah. Thus, Hager comes within the definition of a "Buyer in ordinary course of business" as set out in § 41–01–11(9), N.D.C.C., and, accordingly, he is entitled to the protection of § 41–09–28, N.D.C.C. [§ 9–307, U.C.C.].

Under § 41–09–27, N.D.C.C. [§ 9–306, U.C.C.], the Bank of Beulah has a right only to the proceeds of the sale of the motor vehicle from Chase to Hager, such proceeds being the contract executed by Hager and Chase, and later assigned, for value, from Chase to Dakota National Bank. Thus, the conflicting security interests are not in the motor vehicle itself, but rather in the Hager contract which carried the right to repossession of the motor vehicle.

■ As stated in the 1972 Official Comment, 3 U.L.A.–U.C.C. (Master Ed., 1974 P.P.), priority of conflicting security interests in chattel paper is to be determined by reference to § 9–308, U.C.C. [§ 41–09–29, N.D.C.C.]. The Arkansas Supreme Court has recently decided a case in which § 9–308, U.C.C., was interpreted. *Commercial Credit Corp. v. National Credit Corp.*, 251 Ark. 541, 473 S.W.2d 876 (1971). The facts of *Commercial Credit* are parallel

to the case at bar. National Credit had floor-planned a vehicle for an automobile dealer. The dealer subsequently sold the vehicle and assigned, for value, the consumer's sales contract to Commercial Credit. In holding that Commercial Credit's security interest in the consumer contract prevailed over that of National Credit's, the Arkansas Supreme Court quoted with approval, in *Commercial Credit, supra,* 473 S.W.2d at 880–881 of its opinion, from Spivack, Secured Transactions under the Uniform Commercial Code, prepared for the joint committee on continuing legal education of the American Law Institute and the American Bar Association for September, 1960, at page 106 thereof:

" 'Under certain circumstances it is possible for more than one security interest to exist in the same proceeds. For example, a debtor whose inventory is subject to a security interest may sell an item from that inventory to a consumer buyer who executes an installment sale contract evidencing his promise to pay all or part of the purchase price. The sale to the consumer divests the inventory security interest but the secured party now has a security interest in the installment sale contract or chattel paper proceed. If the secured party does not take possession of the chattel paper proceed and the seller transfers and assigns it to a third party, who is entitled to the proceed, the third party transferee or the holder of the security interest in the inventory? The answer to this question is found in Section 9–308. This Section provides that where a purchaser of chattel paper gives new value and takes possession of it in the ordinary course of his business, he has priority over a security interest in the chattel paper which is claimed as proceeds of inventory. This is true even though the purchaser knows that the specific paper is subject to a security interest in favor of an inventory secured party.' "

We find that the decision in *Commercial Credit* comports with the clear language of § 9–308, U.C.C. In the instant case, it has been shown that Dakota National Bank gave new value for the Hager contract and took possession of the contract in the bank's ordinary course of business. The security interest of Dakota National Bank, therefore, by the terms of § 41–09–29, N.D.C.C., has priority over the Bank of Beulah's claim to the proceeds.

The Bank of Beulah, in its brief and on oral argument, has stressed that it has perfected its security interest while Dakota National Bank has not. It is argued that equity demands that the Bank of Beulah prevail. In response to this argument, we quote from Chrysler Credit Corporation v. Sharp, 56 Misc.2d 261, 288 N.Y.S.2d 525, 534 (1968):

"If there is a usage of trade which exposes an entruster on floor plan to certain risks, these are risks against which he can guard by audits and account procedures or he can refuse to knowingly expose himself to the risk with the particular dealer. To fail to place the exposure of such risk with the entruster in such situation would make it impossible for retail finance companies to do business with any dealer unless the entruster were directly a participant. To hold otherwise, would expose the retail financier to a double loss as against at most a partial loss for both. The proliferation of paper work would be a giant step backwards in modern commercial practice."

The Bank of Beulah, in an argument not pertaining to the merits of this case, has suggested that this appeal should be dismissed because Dakota National Bank has accepted benefits of the trial court's judgment and, therefore, should not be allowed to contest the judgment. It is argued that Dakota National Bank received a benefit when, in accordance with the trial court's judgment, Dakota National Bank yielded possession of the motor vehicle to the Bank of Beulah, thereby avoiding further storage costs. In support of this argument the Bank of Beulah cites general statements of law found in Siedenburg v.

Sommerfeld, 77 S.D. 191, 90 N.W.2d 77 (1958); Miller v. Miller, 76 N.D. 558, 38 N.W.2d 35 (1949) (dissenting opinion); and 4 C.J.S. Appeal and Error § 215 (1957). We have considered this argument and find it to be without merit. The "benefits" received by the Dakota National Bank were not ordered or decreed in the trial court's judgment, nor will such "benefits" be affected by a reversal of that judgment. The case law cited by the Bank of Beulah is inapposite to the argument it makes. In *Siedenburg, supra*, the appellant accepted a sum of money granted him in a quiet title action; in *Miller, supra*, the appellant appealed from a divorce decree which had granted her possession of certain real estate. It is only when an appellant accepts benefits *of the judgment* that an appellant will not be allowed to contest the judgment. Such is not the case before us.

The judgment of the district court is reversed.

PEDERSON, VOGEL and SAND, JJ., concur.

ERICKSTAD, C. J., deeming himself disqualified, did not participate.