COMMERCIAL CREDIT CORPORATION v.
NATIONAL CREDIT CORPORATION

5-5661                                        473 S.W. 2d 876

Opinion delivered December 6, 1971

*Dickey, Dickey & Drake,* for appellant.

*Coleman, Gantt, Ramsay & Cox,* for appellee.

J. Fred Jones, Justice. A. D. Edgerson and Commercial Credit Corporation filed suit in the Jefferson County Chancery Court against National Credit Corporation alleging that Edgerson had purchased an automobile from Howard Mathews Motor Company and had executed a security agreement therefor; that the security agreement had been assigned to Commercial and that the sale to Edgerson passed good and merchantable title in the automobile free of all existing liens, if any, in favor of National Credit. The complaint further alleged that National Credit was in possession of the certificate of title to the automobile and had refused to deliver it to Edgerson or to Commercial Credit. Edgerson and Commercial Credit prayed for a mandatory injunction directing National Credit to deliver the certificate of title to Edgerson so that he could register same and Commercial could perfect its lien as provided by law.

National Credit filed an answer and cross-complaint denying the allegations of the complaint, but admitting that Howard Mathews Motor Company is a dealer in automobiles, and that National Credit is in possession of the certificate of title to the automobile described in the complaint. For its cross-complaint National Credit alleged that it holds, and is entitled to, the title certificate and that if Mathews had sold the automobile to Edgerson, any security agreement executed by Edgerson would represent proceeds from the sale of the automobile to which National Credit and not Commercial Credit would be entitled. National Credit alleged in its

cross-complaint that it is the registered and legal holder of the title to the automobile described in the complaint, and is entitled to any promissory note and security agreement executed by Edgerson in the purchase of the automobile. National Credit prayed that the complaint be dismissed and that if any sale was found to have been made as set out in the complaint, that Commercial Credit be ordered and directed to deliver over to National Credit without warranty or recourse, the security agreement and promissory note of Edgerson, together with all amounts paid by Edgerson to Commercial Credit against his obligation thereon.

The chancellor found that both National Credit and Commercial Credit had a security interest in the automobile purchased by Edgerson but that neither of them had perfected their security interest as required by law. The chancellor further found that National Credit's security interest attached to the automobile before the security interest of Commercial Credit attached, and that under the provisions of the Uniform Commercial Code, Ark. Stat. § 85-9-312 (5) (c) (Add. 1961), National Credit's security interest took precedence over the security interest of Commercial Credit, and the chancellor held:

"[T]hat National Credit is entitled to all of the proceeds from the sale of the Edgerson vehicle in accordance with its contract with Mathews. A judgment will be entered in favor of National Credit against Commercial Credit for the amount that Commercial Credit has collected from Edgerson, and Edgerson will be ordered to make all future payments to National Credit."

A decree was entered accordingly and on appeal to this court Commercial Credit relies on the following points:

"Appellee had no security interest in the vehicle after the sale by Howard Mathews Motor Company and appellant had priority in the proceeds under section 85-9-308 of the Arkansas Statutes.

Appellant is also entitled to priority under section 85-9-312 (5) (b) of the Arkansas Statutes."

The facts as gathered from the testimony and exhibits appear as follows: Howard Mathews Motor Co., hereafter referred to as "Mathews," was engaged in the business of selling used automobiles at retail in Pine Bluff, Arkansas. On December 8, 1969, Mathews signed and delivered to National, a promissory note agreeing that 90 days after date Mathews would pay to the order of National Credit Corporation the sum of $3,950 with interest from date at 10%. On the same date Mathews signed and delivered to National, a bill of sale form reciting that for and in consideration of $3,950 cash paid by National Credit Corporation, Mathews bargained, sold and conveyed to National and unto its successors and assigns a 1968 Ford Galaxie 500—2 door automobile. On the same date Mathews signed and delivered to National, a trust receipt agreeing to hold the automobile in trust for National and to deliver it back to National upon demand. The trust receipt then provides as follows:

"Trustee's possession of said Merchandise hereunder is for the purpose of the sale thereof at retail, in the regular course of business. * * * Trustee shall deliver to Entruster from the proceeds of said sale, the amount of said minimum sale price. Until such delivery, Trustee shall hold the entire proceeds in trust for Entruster; separate from the funds and property of Trustee; if Trustee fails to sell said Merchandise within three months from the date thereof, or within any extended periods agreed upon in writing, or breaches this Trust Receipt, * * * Entruster may take possession of said Merchandise without notice or demand, and for such purpose, it or its representatives may enter any premises without legal process. In any event, Trustee's interest in said Merchandise may be forfeited, at the election of Entruster and, Entruster and Trustee also shall have such other and further rights as may be provided by law."

On December 27, 1969, the Ford Galaxie automobile was sold by Mathews to A. D. Edgerson. In this transaction Mr. Edgerson traded in a 1968 Ford Fairlane automobile which he had previously purchased from Mathews under a security interest contract which had been sold by Mathews to Commercial Credit. According to Mr. Edgerson's testimony, when he entered into the new contract for the purchase of the Galaxie 500, he paid $275 difference between what he owed on the Fairlane and the amount he agreed to pay for the Galaxie. The extra $275 was to be paid over a period of several months and was included in his regular monthly payments of $84.67 he agreed to pay on the Galaxie. Under the sales contract of December 27, Mr. Edgerson agreed to pay a credit life insurance premium in the amount of $68.58, vehicle insurance in the amount of $406, and finance charge in the amount of $423.54, making a total he agreed to pay on his new contract for the purchase of the Galaxie in the amount of $3,593.12.

On December 30, 1969, Edgerson's new contract with Mathews in the purchase of the Galaxie was sold by Mathews to Commercial Credit. As above stated, Commercial Credit had previously purchased the Edgerson contract on the Fairlane and when it purchased the contract on the Galaxie, the contract on the Fairlane was closed out on the books of Commercial Credit by transferring the amount still owed on the Fairlane to the new account on the Galaxie. In addition, Commercial Credit paid to Mathews $406, representing finance charge and premium on credit life insurance Edgerson had obtained in connection with his new obligation.

On February 10 or 11, 1970, National Credit checked the automobiles on Mathews' premises and learned that Mathews had sold the automobile to Edgerson and had sold Edgerson's contract to Commercial Credit. National then called Commercial by phone and advised of what it had learned from Mathews and inquired of Commercial concerning its transactions with Mathews on the Galaxie automobile. After checking the records pertaining to the Galaxie automobile, Commercial advised National that Mathews had indeed sold the automobile to

Edgerson under a security interest contract and that Commercial had purchased Edgerson's contract from Mathews. Commercial demanded the title certificate held by National. National refused to deliver the certificate to Commercial but demanded from Commercial Edgerson's contract of purchase and the amounts paid thereon.

Mathews purchased the Galaxie from a used automobile dealer in Memphis, Tennessee and had obtained a Tennessee certificate bearing a notation of transfer from the individual owner, Donald A. Yates, to the Memphis dealer. The title certificate was not signed in blank by the Tennessee dealer, but apparently Mathews obtained an additional bill of sale which was not made an exhibit in the record. Upon delivery of the note, as above stated, Mathews also delivered to National the Tennessee title certificate. on the automobile. On February 26, 1970, National registered the automobile with the Motor Vehicle Division of the Department of Revenues in Arkansas. An Arkansas certificate of title was issued to National as owner and showing that the automobile was purchased from Donald A. Yates of Memphis, Tennessee. National paid the Arkansas sales tax in the amount of $30.00.

The evidence indicates that National knew Mathews was selling its retail contracts to Commercial. The evidence also indicates that Commercial knew that Mathews was doing some of its wholesale financing (floorplanning) with National, but did not know, until advised by National on February 10 or 11, 1970, that the Galaxie automobile sold to Edgerson was included in Mathews' financing plan with National.

We agree with the chancellor that neither Commercial nor National perfected a security interest in the automobile as provided by statute. National did, on February 26, 1970, register the automobile and obtain a certificate of title in its name as above stated, but no liens were indicated on this certificate. In any event, Mathews had sold the vehicle to Edgerson under National's authority and with its consent, and had sold Edgerson's contract to Commercial 30 days before the title certifi-

cate was issued to National. The parties agree, and the chancellor so found, that Mr. Edgerson is entitled to the possession of the automobile involved, and that he is entitled to a clear title to the automobile when he has paid the amounts he has agreed to pay.

So when the litigation was commenced in this case, Edgerson had possession of the automobile and was entitled thereto. National had the title certificate to the automobile registered in its name as owner. Commercial had Edgerson's contract it had purchased from Mathews and Mathews had the proceeds from the sale of the automobile, including the cash paid by Commercial for Edgerson's contract as well as the Fairlane automobile traded in by Edgerson on the purchase price of the Galaxie. So the contest between Commercial and National is not actually which of them has a prior security interest in the automobile; the actual contest between National and Commercial is which of them is entitled to the payments made and to be made by Mr. Edgerson on the purchase price of the automobile under his contract. Commercial's security interest in the automobile is not questioned, but National contends that it also has a security interest in the automobile and that since its security attached first, it is paramount to Commercial's security interest. We do not agree with this contention. Priorities between National and Commercial as to security interests in the automobile are not important to our decision in this case because National lost whatever security interest it may have had in the *automobile* when it permitted Mathews to sell the automobile in the regular course of Mathews' business, which was the business of selling automobiles at retail.

Under Art. 9 of the Uniform Commercial Code (Ark. Stat. Ann. § 85-9-306 (2) [Add. 1961]) is found the following:

> "Except where this Article [chapter] otherwise provides, a security interest continues in collateral notwithstanding sale, exchange or other disposition thereof by the debtor *unless his action was authorized by the secured party in the security agreement or otherwise, and also continues in an identifiable*

*proceeds including collections received by the debtor."* (Emphasis supplied).

Under Art. 1-201 (9) of the Uniform Commercial Code (Ark. Stat. Ann. § 85-1-201 (9) [Add. 1961]) is found the following:

" 'Buyer in ordinary course of business' means a person who in good faith and without knowledge that the sale to him is in violation of the ownership rights or security interest of a third party in the goods buys in ordinary course from a person in the business of selling goods of that kind. . ."

Article 9-307 (1) of the Uniform Commercial Code (Ark. Stat. Ann. § 85-9-307 (1) [Add. 1961]) provides:

"A buyer in ordinary course of business (subsection (9) of Section 1-201 [§ 85-1-201]) . . . takes free of a security interest created by his seller even though the security interest is perfected and even though the buyer knows of its existence."

Article 9-308 of the Uniform Commercial Code (Ark. Stat. Ann. § 85-9-308 [Add. 1961]) provides as follows:

"A purchaser of chattel paper or a non-negotiable instrument who gives new value and takes possession of it in the ordinary course of his business and without knowledge that the specific paper or instrument is subject to a security interest has priority over a security interest which is perfected under Section 9-304 [§ 85-9-304] (permissive filing and temporary perfection). A purchaser of chattel paper who gives new value and takes possession of it in the ordinary course of his business has priority over a security interest in chattel paper which is claimed merely as proceeds of inventory subject to a security interest (Section 9-306 [§ 85-9-306]), even though he knows that the specific paper is subject to the security interest."

Article 9-311 of the Uniform Commercial Code (Ark. Stat. Ann. § 85-9-311 [Add. 1961]) provides as follows:

"The debtor's rights in collateral may be voluntarily or involuntarily transferred (by way of sale, creation of a security interest, attachment, levy, garnishment or other judicial process) notwithstanding a provision in the security agreement prohibiting any transfer or making the transfer constitute a default."

Even if National had perfected its security interest in the automobile, under the trust receipt signed by Mathews he was authorized by National to sell the automobile involved in this case. It would thus appear that when Mathews sold the automobile to Edgerson under this authority, National's security interest would no longer have followed the automobile but would have only continued in the "proceeds" of the sale going to Mathews. The proceeds of the sale going to Mathews included the conditional sales contract executed by Edgerson, as well as the Fairlane automobile traded in payment for the Galaxie automobile, while such proceeds were in the possession of Mathews. Mathews sold Edgerson's contract to Commercial within three days after he obtained it from Edgerson, and after Mathews sold Edgerson's contract to Commercial, National's security interest would not have followed the chattel paper into the hands of Commercial, but would have continued in the proceeds Mathews received from Commercial in the sale of the chattel paper (contract). Ark. Stat. Ann. § 85-9-306 (Add. 1961) *supra.* See also UCC comments to this section and Spivack at page 100, et seq. of his work on Secured Transactions Under the Uniform Commercial Code prepared for the joint committee on continuing legal education of the American Law Institute and the American Bar Association for September, 1960. The example recited by Mr. Spivack at page 106 of his work is so much in point with the situation in this case, we quote his comment as follows:

"Under certain circumstances it is possible for more than one security interest to exist in the same proceeds. For example, a debtor whose inventory is

subject to a security interest may sell an item from that inventory to a consumer buyer who executes an installment sale contract evidencing his promise to pay all or part of the purchase price. The sale to the consumer divests the inventory security interest but the secured party now has a security interest in the installment sale contract or chattel paper proceed. If the secured party does not take possession of the chattel paper proceed and the seller transfers and assigns it to a third party, who is entitled to the proceed, the third party transferee or the holder of the security interest in the inventory? The answer to this question is found in Section 9-308. This Section provides that where a purchaser of chattel paper gives new value and takes possession of it in the ordinary course of his business, he has priority over a security interest in the chattel paper which is claimed as proceeds of inventory. This is true even though the purchaser knows that the specific paper is subject to a security interest in favor of an inventory secured party."

We are of the opinion, therefore, that the decree of the chancellor must be reversed and this cause remanded with instructions to enter a decree directing National to deliver the title certificate on the vehicle involved to the appellant, Commercial Credit, so that it may deliver same to A. D. Edgerson with its security interest endorsed thereon. National is entitled to recover from Mr. Edgerson the $30.00 it paid for sales tax on the automobile.

Reversed and remanded for entry of a decree not inconsistent with this opinion.

HARRIS, C. J., not participating.