UNITED STATES of America, Plaintiff-Appellee,

v.

Robert D. HENDERSON, Defendant-Appellant.

No. 80–1404.

United States Court of Appeals, Seventh Circuit.

Argued Oct. 23, 1980.

Decided April 6, 1981.

Rehearing Denied June 3, 1981.

Terence F. McCarthy, Federal Defender Program, Chicago, Ill., for defendant-appellant.

Thomas P. Sullivan, U. S. Atty., David Bohan, Asst. U. S. Atty., Chicago, Ill., for plaintiff-appellee.

Before SWYGERT, PELL and CUDAHY, Circuit Judges.

CUDAHY, Circuit Judge.

On February 12, 1980, defendant-appellant Robert D. Henderson was convicted by a jury on nine counts of making false statements to federally insured banks for the purpose of securing loans in violation of 18 U.S.C. § 1014 (1976).[1] The district court sentenced Henderson to a probationary term of 5 years and a $45,000 fine.

On appeal, defendant contends that the evidence was insufficient to sustain his conviction. He also raises various objections to the instructions given to the jury by the district court. We affirm.

## I. Factual Background

In 1973, Henderson and a partner, Doctor Donald Ryan, acquired a Mercury automobile dealership (the "dealership") in Geneseo, Illinois. The dealership soon added a Lincoln automobile franchise, and became known as Geneseo Lincoln-Mercury. Henderson served as president of the dealership, and was responsible for its management and operation.

The dealership financed its new car inventory through a "floor plan" arrangement with the Farmers National Bank of Geneseo, Illinois (the "Farmers Bank").[2] Under this arrangement, Henderson or Ryan signed a personal note and a bill of sale and trust receipt in connection with each new automobile financed by the Farmers Bank.[3] According to the terms of a particular bill of sale and trust receipt, the dealership agreed to transfer nominal ownership of the new automobile to the Farm-

ers Bank while physically retaining possession of the car as trustee for the bank. The legal effect of this arrangement is to create a security interest in the automobile in favor of the Farmers Bank. One of the provisions of the bill of sale and trust receipt gave Henderson the right to sell the entrusted automobile. In the event of such a sale, the bill of sale and trust receipt provided that Henderson was to "hand, as trust funds so received, the avails so soon as received to the entruster to apply against its loan to the trustee . . . ."

Henderson had also owned an automobile leasing company, Bob Henderson Contract Leasing (the "leasing company"), for some time prior to his acquisition of Geneseo Lincoln-Mercury. After 1973, the leasing company obtained at least some of its inventory from the dealership.

Henderson normally transferred the cars himself from the dealership to the leasing company. At times, he would make these transfers at night, leaving notes regarding the transfers on his sales manager's desk the following day. Although he now argues that the dealership "sold" the particular cars which are the subject of the indictment to the leasing company, Henderson usually would not pay for cars when they were transferred and did not pay for the particular cars which are the subject of the indictment at the time of transfer. Margaret R. Behnkendorf, one of Henderson's former employees, testified that, after the Farmers Bank requested payment on "notes

1. Section 1014 provides in pertinent part:
   Whoever knowingly makes any false statement or report . . . for the purpose of influencing in any way the action of any [federally insured] bank . . . upon any . . . loan . . . or the acceptance, release, or substitution of security therefor, shall be fined not more than $5,000 or imprisoned not more than two years, or both.

2. Floor plan arrangements are a common method of financing in the automobile retailing business. Under a floor plan, a dealer's automobile inventory is impressed with a security interest (here through trust receipts) in favor of a secured party (here the Farmers Bank) which finances the inventory. The secured party, as the nominal owner of the financed inventory,

normally entrusts possession of the automobiles to the dealer. The terms of the documents comprising the trust agreement define the dealership's rights and obligations with respect to the entrusted automobiles.

3. Evidence at trial indicated that it is possible for a larger dealer to finance its entire inventory on a personal line of credit. Because Henderson's dealership was small, however, the Farmers Bank separately entrusted each financed automobile to the dealership. Thus, each of the cars financed by the Farmers Bank was purchased with a separate loan and was subject to separate but identical bills of sale and trust receipts.

that were very old," Henderson would send some money to her and instruct her to make payments to the Farmers Bank in a sequence (with respect to the outstanding notes) that bore no relationship to the sequence in which the cars were assertedly "sold" to the leasing company.

At times, Henderson, through his leasing company, would put up cars which had been transferred from his dealership to the leasing company as collateral for additional bank loans. It is this "repledging" of floor-planned automobiles that furnishes the subject matter of the instant case. The indictment alleges that Henderson falsely represented that no prior security interest existed in the cars he pledged as collateral for nine loans he obtained from the Deerbrook State Bank, the North Point State Bank and the Dempster Plaza Bank (collectively, the "local banks").

Each of the identical notes and accompanying security agreements Henderson signed to obtain these loans contained the following representation:

> Debtor covenants, represents and agrees with Bank as follows: (a) That debtor is the sole owner of the collateral free from any lien, security interest, encumbrance or claim and will defend the collateral against the claims and demands of all persons. . . .

Henderson did not inform the local banks that the cars he had pledged as collateral for their loans were also and at the same time subject to the prior lien then imposed by his trust agreement with Farmers Bank. Defendant also failed to notify the Farmers Bank that the automobiles in question had been repledged for value, and he did not apply the proceeds of the subsequent loans to satisfy the indebtedness to the Farmers Bank for the particular cars in question.

## II. Sufficiency of the Evidence

The principal issue on this appeal is whether the evidence was sufficient to support defendant's conviction. Specifically, defendant argues that the government failed to prove beyond a reasonable doubt (1) that a prior security interest existed in

the automobiles at the time the local bank loans were executed, (2) that the allegedly false statements were material, and (3) that defendant made the allegedly false statements with the intent of influencing the local banks.

### A. Standard of Review

Our task on review of the sufficiency of the evidence is limited since we are unable to judge the credibility of the witnesses at trial or carry out other fact-finding functions of the jury. Therefore, in deciding whether the evidence was sufficient to allow the jury to find defendant guilty beyond a reasonable doubt, we must view conflicting evidence and inferences reasonably drawn from the record in the light most favorable to the government. *United States v. Blasco*, 581 F.2d 681, 684 (7th Cir.), *cert. denied*, 439 U.S. 966, 99 S.Ct. 456, 58 L.Ed.2d 425 (1978). Viewed in this light, however, the evidence must not leave a reasonable hypothesis of defendant's innocence unanswered. Otherwise, a reasonable doubt as to defendant's guilt would remain, and a judgment of acquittal would necessarily follow. *See United States v. Fearn*, 589 F.2d 1316, 1321 (7th Cir. 1978) (citing *United States v. Lonsdale*, 577 F.2d 923, 925 (5th Cir. 1978)).

### B. Existence of a Prior Security Interest

Henderson was charged in the indictment with falsely representing to the local banks that there was "no prior security interest" in the automobiles he pledged as collateral for the loans at the local banks. Defendant argues on appeal that this statement was not false since the government's evidence did not and could not have established the existence of a prior security interest in favor of the Farmers Bank.

Henderson cannot seriously dispute that defendant's floor plan agreement gave the Farmers Bank a security interest in the dealership's automobile inventory at the time the floor plan documents were executed. Each of the personal notes executed by Henderson or Ryan at the Farmers Bank states that it is "secured by a trust receipt."

The trust receipts in turn refer to the floor-planned cars as goods held in trust by the trustee (the dealership) for the entruster (the Farmers Bank). And the financing statements or UCC–1's signed by Henderson identified the dealership as "the debtor" and the Farmers Bank as the "secured party." Donald Brown, the government's expert witness, and several local bank witnesses testified that these documents created a security interest in the automobiles in favor of the Farmers Bank.

Henderson argues, however, that the Farmers Bank's security interest was extinguished upon the transfer of the cars to his leasing company. Defendant relies for this argument on Ill.Rev.Stat. ch. 26, § 9–306(2) (1979), which provides:

> Except where this Article otherwise provides, a security interest continues in collateral notwithstanding sale, exchange or other disposition thereof unless the disposition was authorized by the secured party in the security agreement or otherwise, and also continues in any identifiable proceeds including collections received by the debtor.

Under this provision, the security interest of the Farmers Bank continued in an entrusted automobile after Henderson transferred it to his leasing company unless the transfer (or "disposition") was authorized by the trust agreement. To support his conclusion that the transfers (or "dispositions") in question were authorized, Henderson must rely on the following language of the trust receipts:

> [T]he trustee hereby agrees to hold sold merchandise in storage . . . as the property of sold entruster until all the terms hereof have been completed, with, [sic] the liberty *to sell the same for its account, but without liberty to pledge, and in case of sale to hand, as trust funds so received, the avails so soon as received to the entruster* to apply against its loan to the trustee of the sum of _____ and evidenced by a promissory note of even date herewith and further agrees to hold said merchandise and the proceeds thereof in trust for the payments of said bank, and of any other indebtedness of the trustee to the entruster. [Emphasis supplied].

According to defendant, his transfer of cars from the dealership to the leasing company constituted a "sale" within the meaning of the trust receipt and was therefore an "authorized disposition" within the meaning of § 9–306(2). Resolution of this issue depends on the factual determination whether defendant's transfers of the automobiles are properly characterized as "sales" within the meaning of the trust receipts. For, even if it were possible to construe defendant's transfers as "sales" under an oedematous construction of that term,[4] we believe the jury could reasonably have found that such transfers were not "sales" of the sort authorized by the agreement.

The jury could have properly determined that a particular trust receipt gave the dealership the right to sell the entrusted car only on the condition that the proceeds of the sale be immediately applied against the loan secured by the car. In the ordinary situation, automobiles held in the dealership's inventory were presumably sold to retail or wholesale purchasers, who provided the purchase price from their own resources at the time of the sale, or were sold to such purchasers on credit with a new financer providing the purchase price at the time of the sale. In either situation, the purchase price was provided at the time of sale for prompt remittance to the Farmers Bank and application against the indebted-

---

**4.** When defendant transferred the cars to the leasing company, he apparently instructed his employees at the dealership, *inter alia*, to issue certificates of title to the cars which listed the leasing company as owner and one of the local banks as lienholder. The dealership's employees were also instructed to prepare an Illinois sales tax statement and pay state sales tax at the time of each transfer. Defendant therefore argues that the cars were "sold" within the meaning of the Illinois version of the Uniform Commercial Code ("UCC"), which defines a sale as "the passing of title from the seller to the buyer for a price." Ill.Rev.Stat. ch. 26, § 2–106(1) (1979).

ness owed the Bank, to be contemporaneous with the extinguishment of its security interest in the automobile. The president of the Farmers Bank, Kenneth W. Mecum, who negotiated the floor plan arrangement with defendant, testified that the dealer had the right to sell an entrusted automobile "providing he paid the loan." Defendant's former attorney also testified that the trust agreement required the amount of the loan to be repaid once the entrusted car was sold.[5] Therefore, the jury could have reasonably concluded that defendant's sales were authorized under the trust receipt only if they generated immediate proceeds.

However, defendant's alleged "sales" of entrusted cars to the leasing company did not generate immediate proceeds. Mrs.

Behnkendorf, one of the dealership's former employees, testified that when defendant transferred entrusted cars to the leasing company, he frequently did not pay for them.[6] The only proceeds that might have been generated when certificates of title to the cars were issued in the name of the leasing company were rights under an unwritten "understanding" that the leasing company would pay the dealership some money by way of consideration at some time in the future.[7] We believe the jury properly determined that this sort of transfer did not constitute a sale authorized by the trust agreement primarily because such a "sale" generated no immediate proceeds applicable against the inventory loan made by the Farmers Bank.[8]

5. The language of the trust receipt itself strongly suggests that the security agreement contemplated that an authorized sale or disposition would normally generate what are defined in the UCC as "cash proceeds." Thus the trust receipt speaks of handling "as trust funds so received, the avails so soon as received to the entruster to apply against its loan...." *Cf.* Ill.Rev.Stat. ch. 26, § 9–306(1) (1979) ("'Proceeds' includes whatever is received upon the sale, exchange, collection or other disposition of collateral or proceeds.... Money, checks, deposit accounts, and the like are 'cash proceeds'. All other proceeds are 'noncash proceeds'.").

Of course, many transactions may be authorized under the security agreement even though the consideration received in exchange for the entrusted automobile is not exclusively cash proceeds. Thus, in the case of a "trade-in," the "proceeds" include another automobile as well as "cash proceeds." While it is therefore possible that in many authorized transactions, property in addition to cash might be received, that is not the case before us.

6. Charles Goodell, the dealership's sales manager, referred, as Mrs. Behnkendorf had, to the alleged "sales" of the cars to the leasing company as "transfers." Mr. Goodell explained that defendant would often physically remove cars from the dealership at night. On one of these occasions, defendant left Goodell a note that read:

Took some cars that I can convert to leasing company and generate some more cash for here. Please keep this to yourself and say nothing, only we are re-arranging the showroom. Your confidence is most appreciated.

7. If we regard the transfer of an entrusted car as a "sale" which was consummated at the time the subsequent loan was secured by the

leasing company from the local bank, this sale would have been consummated when the local bank advanced the funds. Under this analysis, the security interest of the Farmers Bank would have been terminated only after defendant had already misrepresented to the local bank that the pledged automobile was free of any prior liens.

8. Defendant cites a number of cases in support of his argument that by transferring cars from his dealership to his leasing company he could somehow extinguish the Farmers Bank's prior security interest in the cars. *See, e. g., Commercial Credit Corp. v. National Credit Corp.,* 251 Ark. 541, 473 S.W.2d 876 (1971). In those cases, however, the purchaser of the secured chattel was a "buyer in the ordinary course of business," as defined in UCC § 1–201(9). A buyer in the ordinary course of business is a person who

in good faith and without knowledge that the sale to him is in violation of the ownership rights or security interest of a third party in the goods buys in ordinary course from a person in the business of selling goods of that kind ,...

Ill.Rev.Stat. ch. 26, § 1–201(9) (1979).

Under UCC § 9–307, a buyer in the ordinary course of business takes the purchased chattel free of any security interest even though the security interest is perfected, and even though the buyer is aware of it. Ill.Rev.Stat. ch. 26, § 9–307 (1979). Here, however, defendant's leasing company cannot be considered a buyer in ordinary course. The transfers of cars to the leasing company were in violation of the rights of the Farmers Bank since immediate proceeds were not generated and since the purpose of the transfers was to repledge the cars. From the circumstances surrounding the "assign-

Moreover, because each automobile was the subject of a separate (albeit identical) bill of sale and trust receipt, defendant was obligated to pay off each loan with the proceeds generated by the sale of the particular automobile which secured that loan. Mrs. Behnkendorf testified, however, that when, after inquiries by the Farmers Bank, defendant instructed her to pay off overdue loans, he told her to pay them off in a sequence that bore no resemblance to the order in which the cars were allegedly "sold" to the leasing company. Thus, the jury properly could have also found that defendant's transfers were not authorized under the terms of the trust receipt because he had failed to "hand, as trust funds so received, the avails so soon as received to the entruster to apply against its loan to the trustee . . . ."

In all, there is ample evidence in the record for the jury to conclude that defendant transferred the cars to the leasing company for the purpose of repledging them in violation of the trust agreement. Hence, the record evidence supports a finding that the automobiles in question were subject to prior security interest when Henderson made representations to the contrary.

C. Materiality of the Undisclosed Prior Security Interest

18 U.S.C. § 1014 requires that a false statement be made "for the purpose of influencing in any way the action" of a federally insured bank. The jury could have reasonably determined that Henderson made false statements to the local banks by representing that the pledged automobiles were not subject to any security interest when in fact they were subject to a security

interest in favor of the Farmers Bank. Henderson argues, however, that concealment of the existence of defendant's floor plan was not "material," i. e., was not capable of influencing the banks' actions, since the local bankers testified that they would have made the loans to Henderson even if they had known that the cars had been floor-planned.

This argument misconstrues the nature of the government's case. It is the concealment not of a prior floor plan but of the Farmers Bank's continuing security interest that is alleged to be unlawful. The testimony that the existence of a floor plan would make no difference to the bankers was, of course, based on the assumption that the leasing company had purchased the cars in a bona fide sale and therefore that the security interests of the Farmers Bank in those cars had been extinguished (and that these security interests continued only in the proceeds of the sales).

However, if the transfers of the cars were sham or ineffective "sales" and therefore not authorized by defendant's trust agreements, the security interest of the Farmers Bank in the cars would have continued notwithstanding defendant's unauthorized transfers. In the event the security interest of the Farmers Bank had so survived, several bank witnesses testified that they would have made the loans to defendant, if at all, only on the condition that the funds advanced be used to pay the Farmers Bank's prior loans and thereby extinguish its liens. Thus, defendant's failure to disclose the Farmers Bank's security interest was clearly capable of influencing the actions of the local banks and therefore "material" under 18 U.S.C. § 1014. *See*

ment" of cars, defendant's bad faith was apparent.

Defendant has also referred us to *In re Kittyhawk Television Corp.*, 383 F.Supp. 691 (S.D. Ohio 1974), *rev'd*, 516 F.2d 24 (6th Cir. 1975). In that case, certain assets subject to a lien of RCA were transferred from Kittyhawk Broadcasting Corporation to Kittyhawk Television Corporation. The Television Corporation and the Broadcasting Corporation shared the same shareholders, officers, directors and places of business. In reversing the determination of the district court that the transfer of assets was an

"authorized disposition" of the collateral which extinguished RCA's security interest in the assets, the court of appeals reasoned that the ostensible "sale" of assets by one of the Kittyhawk corporate entities to the other was in reality nothing more than a change of name by the debtor. Hence, RCA's prior lien on the transferred assets was not extinguished. Here, as in *Kittyhawk*, the substantial identity of the purchaser and the seller of the pledged collateral makes it less likely that the transaction was a bona fide sale. *See also* note 5, *supra*.

*United States v. Kennedy,* 564 F.2d 1329, 1340 (9th Cir. 1977), *cert. denied,* 435 U.S. 944, 98 S.Ct. 1526, 55 L.Ed.2d 541 (1978).[9]

### D. Intent to Influence

Henderson argues that the government did not establish beyond a reasonable doubt that he made false statements with the intent to influence the local banks. Although no direct evidence of defendant's intent was offered, "proof of intent through the use of circumstantial evidence in such cases is not unusual," *United States v. Miller,* 573 F.2d 388, 391 (7th Cir. 1978), and here there was sufficient evidence to support the inference that defendant concealed the existence of the prior security interest for the purpose of influencing the local banks to make loans payable directly to the leasing company instead of to the Farmers Bank. The jury could have reasonably drawn the inference that Henderson was a sophisticated businessman who had broad experience in arranging financing for automobile purchases. Thus, defendant would have been aware that the existence of a prior security interest would have influenced the decision of the local banks to accept the automobiles as collateral. The jury also heard evidence of defendant's surreptitious activities in removing automobiles from the dealership at night. In addition, defendant wrote in a note to his sales manager that the purpose of the assignments of the cars was to "generate more cash" for the dealership. This additional cash was generated only by concealing the existence of the Farmers Bank's prior security interest from the local banks. From all this evidence the jury could have reasonably concluded that defendant intentionally concealed the existence of the prior security interest so that he could unlawfully repledge the cars to raise the cash he needed.[10]

### III. Instructions

Defendant also raises various objections to the district court's jury instructions. Two of these objections involve the definitions of the terms "encumbrance" and "pledge", for which defendant proposed the following instructions:

> 16. The Illinois statutes define encumbrance as follows: encumbrance primarily includes real estate mortgag-

**9.** Defendant's failure to disclose the Farmers Bank's security interest would have been material even if, as appears to be the case, the security interest of the Farmers Bank had not been perfected because the Bank had not filed a timely financing statement as required by Ill.Rev.Stat. ch. 26, §§ 9–301, 9–302 (1979). Even if actual notice by the local banks of the prior security interest would not have normally subordinated their lien to that of the prior lienholder, *see* Ill.Rev.Stat. ch. 26, § 9–301(1)(b) (1979), a deliberate effort by the local banks to subject the cars to substitute security interests in full knowledge that the indebtedness to the Farmers Bank was still outstanding (and its lien undischarged) would presumably have been an act of bad faith and therefore invalid for purposes of establishing a preferred creditor status under the UCC. *See* Ill.Rev.Stat. ch. 26, § 1–203 (1979); *Central Soya Co. v. Bundrick,* 137 Ga.App. 63, 222 S.E.2d 852, 855 (1975) ("[A] lack of good faith on the part of a secured creditor may alter the priorities which would otherwise be determined by Article 9 provisions.").

In any event, knowledge of the prior security interest could well have been found to be material because local bank witnesses testified that they would not have made the loans to defendant (and thereby created a second lien) if they had known that Farmers Bank had a continuing, if unperfected, prior lien, because they believed that to have done so would have been unethical, immoral and illegal.

**10.** Defendant also argues that there was no intentional concealment of the prior security interests because he supplied the local banks with factory invoices which listed the Farmers Bank as the floor-planner of the automobiles. Several of the local bank witnesses testified, however, that they could not recall whether defendant had brought the factory invoices to their attention. They also testified that they would not have necessarily concluded from the invoices that a prior lien was attached at that time to the cars. The jury could have inferred that defendant knew the local bankers would not scrutinize the invoice to determine whether the cars were covered by a continuing floor plan, and that the submission of the factory invoices was not intended to, and in fact did not, put the banks on notice that defendant's cars were subject to a continuing security interest. From the totality of defendant's conduct the jury could have reasonably concluded that he intended to convey the impression that his leasing company owned the cars free of any liens or encumbrances.

es and other liens on real estate and all other rights in real estate that are ownership interests.

17. The accepted legal definition of a pledge is as follows: the debtor, who is called a pledgor, transfers possession of an asset to the lender, the pledgee, who retains possession of the assets until the debtor has paid his debt.

█ Proposed instruction 16 was refused because defendant would not agree to amend the definition of "encumbrance" to make clear that the term includes liens on chattels as well as real property. Evidence in the case clearly supported the amendment and the district court was well within its discretion in declining to give the instruction as submitted.

█ As to proposed instruction 17, testimony at trial established that if there was an "accepted legal definition" of "pledge," it did not necessarily have as one of its elements the transfer of possession of collateral. We can take judicial notice of the fact that, although in its narrower meaning in security law a "pledge" involves transfer of possession of collateral to the lender, in its broader usage to "pledge" simply means to put up as collateral. The district court properly declined to give this instruction as well.

█ Defendant also sought several proposed instructions referring respectively to the disbursement of funds obtained from the proceeds of loans from the local banks and to defendant's endorsement of checks received from the banks. He sought to have the jury instructed that nothing done by defendant, including the endorsement of the checks received from the local banks, could have been intended, or done for the purpose of, influencing the banks in making the loans. Such instructions would have been tantamount to a directed verdict of acquittal and would have been clearly inappropriate.

█ Defendant also objected to the reading of the following instruction to the jury:

Illinois Revised Statute, Chapter 26, Section 9–306.01, provides in pertinent part as follows:

It is unlawful for a debtor under the terms of a security agreement . . . (b) who has a right of sale or other disposition of the collateral and is to account to the secured party for the proceeds of any sale or other disposition of the collateral, to sell or otherwise dispose of the collateral and willfully and wrongfully to fail to pay the secured party the amount of said proceeds due under the security agreement.

You may consider this statute only with respect to the state of mind of the loan officers and officials of Deerbrook State Bank, North Point State Bank, and Dempster Plaza State Bank in reviewing the defendant's loan applications.

One of defendant's theories of the case was that the existence of a floor plan and a prior security interest in the cars would have had no effect on the decision of the local banks to make loans to the leasing company. The Illinois statute recited in the instruction might have influenced the bankers in their decision to advance funds to defendant and was therefore material to their state of mind about making the loans. The instruction was made for this purpose and was entirely appropriate.

█ In addition, defendant alleges that the district court erred in giving the following instruction: "If you find that a prior security interest existed in an automobile offered as security for a loan, knowingly failing to disclose such a prior security interest is a false statement of material facts." Before giving this instruction the district court had indicated it would omit the words "material facts." After the court inadvertently reinstated those words in the instruction as given, however, defendant did not renew his objection. By failing to object to the instruction as given before the jury retired, defendant waived his objection to the instruction. *See United States v. Barrett*, 539 F.2d 244 (1st Cir. 1976). We have frequently indicated that objections to instructions should be stated on the record after the giving of the charge, although defense counsel may at that time merely incorporate objections made at an earlier Fed.R.Crim.P. Rule 30 conference.

See *United States v. Hollinger,* 553 F.2d 535, 543 (7th Cir. 1977), *overruling United States v. Wright,* 542 F.2d 975, 983–86 (7th Cir. 1976), *cert. denied,* 429 U.S. 1073, 97 S.Ct. 810, 50 L.Ed.2d 790 (1977). Although this process of incorporation is often *pro forma,* here it would have allowed the district court to correct its error before the jury retired. Having failed to give this opportunity to the district court, defendant is unable to prevail on appeal in his challenge to the district court's alleged error.

### IV. Conclusion

We therefore conclude that defendant's conviction must be AFFIRMED.