UNITED STATES of America,
Plaintiff–Appellee,

v.

William F. SHRIVER,
Defendant–Appellant.

No. 87–2279.

United States Court of Appeals,
Seventh Circuit.

Argued Jan. 14, 1988.

Decided March 29, 1988.

Robert N. Meyeroff, Milwaukee, Wis., for defendant-appellant.

Matthew L. Jacobs, Asst. U.S. Atty., Patricia J. Gorence, U.S. Atty., Milwaukee, Wis., for plaintiff-appellee.

Before FLAUM and RIPPLE, Circuit Judges, and ESCHBACH, Senior Circuit Judge.

FLAUM, Circuit Judge.

William F. Shriver was convicted on three counts of knowingly making false statements to influence a federally insured bank in violation of 18 U.S.C. § 1014 (1982).[1] Shriver appeals his conviction on three grounds: (1) the district court erred in admitting the impermissibly prejudicial testimony of a businessman, William Wooten, whose company had prior business dealings with Shriver; (2) there was insufficient evidence to convict Shriver on counts II and III; and (3) the judge erroneously instructed the jury that Shriver's statements to the bank were material. We affirm on all issues.

I.

In late 1982, Shriver formed Auto Shield, Inc. Early in the following year Auto Shield entered into a franchise agreement with Tuff Kote Dinol, Inc. ("Tuff Kote") which entitled Auto Shield to provide Tuff Kote rustproofing services to the public ("the franchise agreement"). Auto Shield had substantial obligations to Tuff Kote under the franchise agreement. These obligations included a promissory note owed to Tuff Kote representing the unpaid portion of a $19,000 franchise fee, specified royalty payments, and commitments to purchase equipment and material from Tuff Kote.[2] Auto Shield borrowed approximate-

---

1. The statute provides in part that "[w]hoever knowingly makes any false statement or report, ... for the purpose of influencing in any way the action of ... any bank the deposits of which are insured by the Federal Deposit Insurance Corporation ... upon any application, advance ... or loan ... shall be fined not more than $5,000 or imprisoned not more than two years or both." 18 U.S.C. § 1014 (1982).

2. Tuff Kote has over 100 franchise outlets in the United States operated by independent fran-

chisees. Shriver's franchise, operated through Auto Shield, was located in Kenosha, Wisconsin. In the fall of 1983 Auto Shield opened a second Tuff Kote franchise located in Lake Bluff, Illinois. Under the second franchise agreement Auto Shield was also obligated to pay Tuff Kote a franchise fee and to make additional equipment and material purchases. This franchise, like the franchise in Kenosha, was terminated by Tuff Kote in July of 1984.

ly $72,000 from Lakeview Bank to get its business started.

On August 17, 1983, Auto Shield borrowed $95,000 from First Illinois Bank of Evanston ("First Evanston"). Auto Shield used approximately $65,000 of the loan proceeds to repay a substantial portion of its loan from Lakeview Bank and allocated the remainder to working capital. This loan was secured by a "blanket" security interest in all of Auto Shield's receivables, inventory and equipment.[3] Shriver also personally guaranteed the loan to Auto Shield and secured the guaranty with a security interest in his residence. Auto Shield continued to borrow from First Evanston. Its total obligation to First Evanston was consolidated into a 5–year note for $143,500 on March 4, 1984. At the time Auto Shield signed this note, it was experiencing financial difficulties. It made what was to be the last payment to First Evanston on March 15, 1984.

In mid–1984, Shriver personally borrowed a total of $20,000 from two different banks. In April he borrowed $10,000 from the First National Bank of Lake Forest ("First Lake Forest"), and in June he received a $10,000 loan from Midwest National Bank of Lake Forest ("Midwest National").

Shortly thereafter, Tuff Kote notified Auto Shield that it was terminating the franchise agreement. Beginning with a letter dated October 28, 1983, Tuff Kote sent a series of letters notifying Auto Shield that payments for equipment and materials purchased by Auto Shield on account were delinquent. Auto Shield's failure to correct this situation resulted in the notice of termination being sent on July 2, 1984.

On July 23, 1984, Shriver, acting in his capacity as President of Auto Shield, borrowed $10,000 from First Bank Southeast National Association ("Bank Southeast").[4] Shriver's statements in this transaction re-sulted in his indictment and eventual conviction. First, Shriver signed a personal financial statement which stated that he individually did not have any outstanding notes payable to other banks or outstanding contingent liabilities. At this time, however, Shriver's two $10,000 loans (in the form of notes payable) from Midwest National and First Lake Forest were still outstanding. Shriver's personal guaranty of Auto Shield's loan from First Evanston was also outstanding. Count I of the indictment charged Shriver with failing to disclose this information to Bank Southeast in violation of § 1014.

Second, Shriver, acting as president of Auto Shield, signed a "Chattel Security Agreement" which granted a security interest to Bank Southeast in Auto Shield's inventory and equipment and stated that this collateral was free of any prior encumbrances, liens, or security interests. This representation was incorrect because the security interest Auto Shield had granted to First Evanston was still outstanding. Count II charged Shriver with making this false statement.

Finally, Shriver also signed a "General Business Security Agreement" which again warranted that Auto Shield owned the collateral covered by the Chattel Security Agreement and stated that it was free and clear of any other encumbrances and security interests. The General Business Security Agreement also warranted that Auto Shield was not in default under any other agreement for the payment of money. Evidence was introduced at trial, however, which indicated that Auto Shield was in default both on its loan from First Evanston and under its franchise agreement and promissory note with Tuff Kote at the time Shriver signed the General Business Security Agreement. Nonetheless, the indictment did not charge Shriver with a violation of § 1014 resulting from his failure to

---

3. The defendant argues that there was insufficient evidence for a reasonable jury to find that this security agreement actually existed. *See infra* part III.

4. Both parties agree that Bank Southeast is a "bank the deposits of which are insured by the Federal Deposit Insurance Corporation" and therefore a person knowingly making a (material) false statement to Bank Southeast would be in violation of 18 U.S.C. § 1014.

disclose Auto Shield's default on the Tuff Kote franchise agreement. Rather, count III of the indictment was limited to: (1) Shriver's false representation that Auto Shield's assets were not subject to a prior security interest, and (2) Shriver's failure to disclose Auto Shield's default on its loan with First Evanston.

Shriver's first trial ended in a hung jury. On July 15, 1987, he was re-tried and found guilty by the jury on all three counts. Shriver was sentenced to four years probation. He was required to spend the first 180 days of his probation at a community treatment center where he had work release privileges, but was forbidden from consuming alcohol.[5] He was also required to make restitution of $13,700 to Bank Southeast.

## II.

Shriver first argues that the district court erred by admitting into evidence the testimony of Tuff Kote's representative, William Wooten. The substance of Wooten's testimony related to the formation and terms of the franchise agreement between Auto Shield and Tuff Kote and Auto Shield's ultimate failure to comply with this agreement. Shriver claims that Wooten's testimony was irrelevant to the issue of whether he made misrepresentations to a bank. He argues that because no one claimed that he made misrepresentations to Tuff Kote, Wooten's testimony was introduced solely to create the impression that he lacked good character. In Shriver's view, this testimony created a danger of prejudice that outweighed any probative value the evidence may have had as to any crime charged in the indictment and should have been excluded under Federal Rules of Evidence 403 and 404(b).

Rule 404(b), commonly known as the "prior bad acts" rule, states that:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of *motive*, opportunity, intent, preparation, plan, *knowledge*, identity or absence of mistake or accident.

Fed.R.Evid. 404(b) (emphasis added). The purpose of the rule is to prevent evidence of a defendant's crimes or acts from being admitted merely to suggest that "a man with such a defect of character is more likely than men generally to have committed the act in question." 2 J. Weinstein & M. Berger, Weinstein's Evidence § 404[8]. Admission of evidence of other "bad acts" is permissible if it is offered for purposes other than to show that the defendant "acted in conformity with his character." *Id.* The government argues that Wooten's testimony was properly admitted because it was probative of Shriver's knowledge of

---

**5.** A district court, as a condition of probation, could require a defendant "to reside in or participate in the program of a residential community treatment center, or both, for all or part of the period of probation." 18 U.S.C. § 3651 (repealed effective November 1, 1987). Here the presentence report contained statements by Shriver's former wife, former lawyer, and former physician, that indicated that Shriver had a drinking problem. After reviewing this report and affording Shriver and his counsel an opportunity to contest the report, Judge Curran sentenced Shriver. The Probation/commitment order issued on July 29, 1987 stated in part that:

> Defendant is to spend 180 days in a community treatment center.... No alcohol is to be consumed during stay at the center. All nonworking hours, except reasonable travel time, are to be spent in the facility and the defendant is allowed out of the facility no more than 12 hours per day. The defendant is to participate in a drug and alcohol treatment pro-

gram with periodic urinalysis checking at the direction of the probation department.

Shriver argues, without any legal analysis, that there was insufficient factual basis for the district court to order him to spend 180 days at the community treatment center subject to periodic alcohol and drug testing. *See Beard v. Whitley County REMC,* 840 F.2d 405, 408 (7th Cir.1988) (issues raised on appeal must be supported by appropriate judicial authority).

Assuming the issue was properly raised, our review of special conditions of probation is limited to determining whether the district court judge abused his or her discretion. *United States v. Williams,* 787 F.2d 1182, 1185 (7th Cir.1986). In this case Judge Curran reviewed the presentence report, and was skeptical, in light of Shriver's denial of any alcohol problem, of Shriver's capacity to recognize and address such a problem. We find that Judge Curran carefully considered Shriver's sentence and did not abuse his discretion.

comparatively sophisticated business matters and his motive for making the alleged misrepresentations.

■ Initially we note that Wooten's testimony that Shriver negotiated and signed the franchise agreement on behalf of Auto Shield does not put in issue Shriver's character or otherwise suggest any propensity to commit a crime. Testimony that a person entered into a bona fide contract with a major franchisor in order to open a rust-proofing business does not introduce the danger of prejudicial effect that Rule 404(b)'s prohibition against "character" evidence is intended to prevent. This evidence demonstrated that Shriver had some experience with relatively sophisticated business transactions and thereby helped show that he understood how security interests were created and their legal significance; this evidence does not speak to his character and is not prejudicial. We therefore hold that the district court properly admitted Wooten's testimony as to the formation and details of the franchise agreement.

■ In contrast, evidence that Auto Shield defaulted on the Tuff Kote franchise agreement implicates Shriver's character and is potentially inadmissible under Rules 404(b) and 403. First, a contract default is an "act" within Rule 404(b) and as defendant argues in his brief, a default may suggest to the jury that the defendant is a "deadbeat" and therefore is the type of person who would lie to a bank to obtain money. More importantly, the failure to disclose the default was also a false statement which potentially violated § 1014, although no charges were brought. Paragraph 2 of the General Business Security Agreement which Shriver signed as President of Auto Shield in conjunction with the July 24, 1984 loan from Bank Southeast states that the "Debtor warrants that while any of the obligations are unpaid: ... (g)

... Debtor is not in default under *any agreements for the payment of money.*" [6] (emphasis added). Mr. Wooten testified that beginning in late 1983 Tuff Kote had sent a number of letters to Auto Shield indicating that the company was not meeting its financial obligations as they became due under the franchise agreement. Wooten further testified that this process culminated on July 2, 1984 when Tuff Kote sent notice to Auto Shield terminating Auto Shield's rights as franchisee for failure to submit sales reports and invoices and for nonpayment of royalty obligations, amounts due on account, and installments on its note.[7] Wooten's testimony therefore suggests that the representation made by Shriver in the General Business Security Agreement was false.

The government charged in count III that Shriver violated 18 U.S.C. § 1014 when he represented to Bank Southeast that Auto Shield was not in default on any obligations when in fact he knew that Auto Shield was in default on its loan from First Evanston. Shriver was not charged with making a false statement regarding Auto Shield's default on the franchise agreement. The government then proceeded to introduce evidence which indicated that Auto Shield was in default under two agreements for the payment of money: (1) the Tuff Kote franchise agreement and (2) the First Evanston loan. Wooten's testimony as to the franchise agreement default therefore is "bad acts" evidence within the meaning of Rule 404(b).

The admissibility of "bad acts" evidence is generally governed by the four-part standard set forth in *United States v. Shackleford,* 738 F.2d 776 (7th Cir.1984).

> Admission of evidence of prior or subsequent acts will be approved if (1) the evidence is directed toward establishing

6. This phrase is not specifically defined in the security agreement, and the agreement instructs that terms not otherwise defined are to be given their ordinary meaning under Wisconsin law. We do not believe that Wisconsin law would interpret *"any* agreements for the payment of money" to somehow exclude franchise agreements, nor would this reading make sense from

the perspective of the bank for whose benefit the security agreement was entered.

7. At trial Shriver stated that he was not in default under the franchise agreement. He claimed that Tuff Kote failed to live up to its half of the bargain because it did not undertake certain business development activities which were required under the franchise agreement.

a matter in issue other than the defendant's propensity to commit the crime charged, (2) the evidence shows that the other act is similar · enough and close enough in time to be relevant to the matter in issue (i.e., such that "the consequential fact may be inferred from the proffered evidence," 2 J. Weinstein & M. ·Berger, Weinstein's Evidence § 404[8] at 404–49 (1982)), (3) the evidence is clear and convincing, and (4) the probative value of the evidence is not substantially outweighed by the danger of unfair prejudice.

*Id.* at 779 (citation omitted).

■ The government argues, and we agree, that Wooten's testimony was properly offered to establish Shriver's motive for making the false statements to Bank Southeast, not to show Shriver's propensity to commit the crime. Wooten's testimony indicated that Auto Shield, Shriver's business, was unable to satisfy its obligations to Tuff Kote under the franchise agreement. This testimony, in conjunction with other evidence presented at trial, showed that Shriver was a small businessman whose company was experiencing financial difficulties and was in danger of losing its legal right to provide Tuff Kote rustproofing services, a principal portion of the company's business. Auto Shield's need for financial assistance—to repay Tuff Kote and stay in business—provided a motive for Shriver to falsely represent the financial position of both the company and himself in order to influence Bank Southeast to make a loan the bank might otherwise not have made.

The timing is also compelling. Shortly after Wooten received notice in early July, 1984 that Tuff Kote was terminating the franchise agreement, he made misrepresentations to Bank Southeast to obtain a loan that can be reasonably viewed as a last ditch effort to save his business. The Wooten testimony was therefore directed "toward establishing a matter in issue other than the defendant's propensity to commit the crime charged." *Shackleford*, 738 F.2d at 779.

■ The second prong of the test requires that "the other act [must be] ... similar enough and close enough in time to be relevant to the matter in issue." However, in cases where the "bad acts" evidence is introduced to show the defendant's motive for committing the charged offense, we have concluded that similarity is not an appropriate requirement. *United States v. Fakhoury*, 819 F.2d 1415, 1420–21 n. 4 (7th Cir.1987), *cert. denied*, — U.S. —, 108 S.Ct. 749, 98 L.Ed.2d 762 (1988); *United States v. Byrd*, 771 F.2d 215, 220 n. 1 (7th Cir.1985). This is because the similarity between the act and the charged offense is not related to the quality of the evidence of a defendant's motive. In Shriver's case, the government introduced evidence of the default in order to show the financial pressure on Shriver at the time the false statements were made, and thereby establish that Shriver had a particularly powerful incentive to make such statements. The lack of similarity between defaulting on a franchise agreement and making false statements to a bank does not make the default less probative of Shriver's motive, nor does the dissimilarity implicate Shriver's character any more than if the acts were similar.[8] The similarity requirement arose in cases where "bad acts" evidence was introduced to show intent; it is not applicable where the "bad act" is intended to show motive.

■ We also find that the other requirements of the *Shackleford* test were met. Wooten's testimony, corroborated by Tuff Kote documentation, was clear and convincing. Thus, the third prong was satisfied.

---

8. As we observed, both the default itself and the failure to disclose the default to Bank Southeast can be viewed as "bad acts." Coincidentally, the failure to disclose the Tuff Kote default was very similar to the charge in the indictment that Shriver failed to disclose Auto Shield's default on the First Evanston loan. *See, e.g., United States v. Brantley*, 786 F.2d 1322, 1329 (7th Cir.),

*cert. denied*, 477 U.S. 908, 106 S.Ct. 3284, 91 L.Ed.2d 572 (1986) (misappropriation of funds by use of youth organization's credit card for personal purposes admissible to show defendant's intent, and is similar to charge of defrauding the organization in a furniture leasing arrangement).

The final prong provides that relevant evidence may be excluded if the danger of its prejudicial effect substantially outweighs its probative value. The district court conducts this balancing and our review is limited to determining whether the judge abused his or her discretion. *United States v. Liefer*, 778 F.2d 1236, 1244 (7th Cir.1986). It is conceivable that the jury believed, as an unavoidable byproduct of Wooten's testimony, that Shriver had "poor character" and was therefore likely to lie to a bank. Shriver also argues that the jury possibly confused evidence of the Tuff Kote default with the evidence of the First Evanston default, the only default put in issue by the indictment. However, as previously discussed, this testimony was very probative as to Shriver's motive for making the false statements. The evidence established that Shriver needed money to keep his business from losing the right to provide rustproofing under the franchise agreement. The district court did not abuse its discretion when it determined that any prejudicial effect of this testimony was outweighed by the probative value of the testimony. We hold that Wooten's testimony was properly admitted into evidence.[9]

## III.

Shriver also challenges the sufficiency of the evidence supporting his conviction on Counts II and III. He argues that there was insufficient evidence for a reasonable jury to find that First Evanston had a security interest in Auto Shield's assets. He points out that the government never introduced into evidence the actual security agreement that the government claims granted First Evanston a prior security interest in Auto Shield's assets. In Shriver's view, the government failed to show the existence of the prior security agreement and therefore also failed to show that his representation to Bank Southeast that Auto Shield's assets were not subject to a prior security interest was false.

The standard of review governing a defendant's claim that there was insufficient evidence to support a jury verdict is well established. We must determine "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Fakhoury*, 819 F.2d at 1418 (*quoting Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979) (emphasis in original)).

We find that despite the government's failure to produce the First Evanston security agreement, there was sufficient evidence to sustain the conviction.[10]

9. At trial, Shriver objected only to the introduction of the Tuff Kote documents, not to Wooten's testimony as to their contents. As a result, even if we had concluded that it was error to admit Wooten's testimony relating to Auto Shield's default under the franchise agreement, Shriver would have been required to show that it was plain error.

10. At oral argument Shriver's counsel indicated that he believed that the existence of a security agreement could not be proven by oral testimony. Section 9–203 of the Uniform Commercial Code does require, in part, that the debtor sign a security agreement which contains a description of the collateral in order to create a security interest that is enforceable against the debtor or third parties. This section does not, however, address how the existence of a written security agreement is to be proven at trial. The method of proof is governed by the rules of evidence.

Federal Rule of Evidence 1002, commonly known as the "best evidence rule," generally requires that the original document itself be introduced to show the contents of the document. At trial, the First Evanston loan officer who handled the loan testified that a security agreement covering Auto Shield's assets existed between First Evanston and Auto Shield on July 24, 1984. Shriver failed to object when this evidence was introduced on direct examination. When the testimony was repeated on redirect examination, Shriver objected on the grounds that there was no foundation for the testimony. Shriver did not, however, raise a "best evidence" objection. The importance of both a timely and proper objection is illustrated by this case. Federal Rule of Evidence 1004 is an exception to Rule 1002 and provides that "other evidence of the contents of a writing ... is admissible if—(1) ... [a]ll originals are lost or have been destroyed, unless the proponent lost or destroyed them in bad faith...." At oral argument the Assistant United States Attorney indicated that the government had been unable to locate the security agreement that the loan officer testified he had prepared. The government therefore might well have met the requirements of the "lost document" exception found in Rule

First, Mark R. Frank, the First Evanston loan officer who handled the Auto Shield loan, testified that a security agreement had been entered into pursuant to First Evanston's loan to Auto Shield, that he recalled preparing the documentation, and that the agreement was still in effect on July 23, 1984 (the date Shriver entered into the agreement with Bank Southeast). In addition, the government introduced financing statements which were filed in Illinois and Wisconsin. The purpose of these statements was to notify third parties of the possibility that a security agreement existed between First Evanston and Auto Shield. The financing statements were signed by Shriver on behalf of Auto Shield. Although the financing statements themselves do not constitute a security agreement in this case, they do corroborate Frank's testimony. We hold that there was sufficient evidence for a reasonable jury to find beyond a reasonable doubt that a security agreement existed between First Evanston and Auto Shield on July 23, 1984 and therefore that Shriver violated § 1014 as charged in counts II and III.

## IV.

Shriver's third argument is that the district court erred when it instructed the jury that the alleged misrepresentations, if found to exist, were material.[11] Shriver argues that the issue of whether his false statements were material should have been decided by the jury.

As a threshold matter we note that the plain language of 18 U.S.C. § 1014 does not require that the misrepresentation be material. The statute provides that "[w]hoever *knowingly makes any false statement* or report" in order to influence an FDIC bank commits a crime; the word material does not appear. 18 U.S.C. § 1014 (emphasis added). We, however, have assumed that materiality is an element of § 1014. *Unit-*

1004 if a properly raised objection had put the matter in issue. Because no such objection was made, the government was not put to this task and the best evidence issue was waived.

**11.** There is some ambiguity as to whether Shriver contests the district court's holding that the misrepresentations were material, or just that the judge was not the proper person to make this decision. Assuming that the issue was properly raised, we find that the misrepresentations were material.

Although there was testimony that the Bank Southeast loan officer did not specifically rely on Shriver's false statements, reliance and materiality are not the same thing under § 1014. *United States v. Braverman*, 522 F.2d 218, 223 (7th Cir.), *cert. denied*, 423 U.S. 985, 96 S.Ct. 392, 46 L.Ed.2d 302 (1975). The most comprehensive discussion of this issue is found in *United States v. Goberman*, 458 F.2d 226 (3rd Cir. 1972). In *Goberman* the Third Circuit rejected the defendant's argument that the misstatements were not material because the bank did not rely on them.

The appellant misconceives the meaning of materiality in Section 1014. It is not merely directed to false statements which are actually used in the decision to make a loan. It requires that all statements supplied to lending institutions such as Federal Savings & Loan Associations, which have the capacity to influence them, be accurate or at least not knowingly false. Requiring proof of reliance on the statement by the lending institution would wreak havoc with enforcement of the provision. A successful prosecution for the viola-

tion would depend on the wholly fortuitous factor of *actual reliance* and not at all upon the intent of the guilty party. The obvious result would be that not all statements which could potentially harm the United States would be subject to prosecution, undermining the legitimate purpose Congress sought to achieve.

*Id.* at 229 (citations omitted) (emphasis in original). *See also United States v. Phillips*, 606 F.2d 884, 886 (9th Cir.1979), *cert. denied*, 444 U.S. 1024, 100 S.Ct. 685, 62 L.Ed.2d 657 (1980) (defendant's misrepresentation of her birth date and social security number were material false statements); *United States v. Cleary*, 565 F.2d 43, 46 (2nd Cir.1977). In *Braverman* we stated that:

The fact that [the bank officer] granted the loan before the statement was submitted is irrelevant since, as the defendant concedes, materiality does not depend upon actual reliance. Although the loan was granted before the [false] statement was submitted, [the bank officer] granted the loan with the knowledge and assurance that the statement would be forthcoming.

522 F.2d at 223 (citations omitted). Similarly, in order to make the loan, Bank Southeast required certain documents, including those which contained the false statements. Shriver's failure to disclose Auto Shield's default on a $143,500 note, the prior security interest in Auto Shield's assets, and Shriver's own outstanding personal loans and contingent liability, had the capacity to influence Bank Southeast. We hold that these were material misstatements.

ed States v. Henderson, 645 F.2d 569, 575 (7th Cir.), cert. denied, 454 U.S. 850, 102 S.Ct. 289, 70 L.Ed.2d 139 (1981); Braverman, 522 F.2d at 223.[12] Other circuits have also reached this result. See, e.g., United States v. Bonnette, 663 F.2d 495, 497 (4th Cir.1981), cert. denied, 455 U.S. 951, 102 S.Ct. 1456, 71 L.Ed.2d 666 (1982); Goberman, 458 F.2d at 229.

The issue of who should determine the materiality of a false statement under § 1014 is apparently an issue of first impression in this circuit. In Henderson the question of the materiality of the false statement was left to the jury, but the matter was not put in issue. 645 F.2d at 575. The Second Circuit has concluded that under § 1014 "any question of materiality would be for the court, not the jury." United States v. Cleary, 565 F.2d 43, 46 (2nd Cir.1977), cert. denied, 435 U.S. 915, 98 S.Ct. 1469, 55 L.Ed.2d 506 (1978) (citations omitted). The Second Circuit supported its conclusion by citing to other cases which held that materiality in general is a question to be decided by the district court as a matter of law. Our circuit has reached the same conclusion in other contexts.

The clearest analogy is to those cases where the defendant was charged with violating 18 U.S.C. § 1001. Section 1001 prohibits making statements known to be false "in any matter within the jurisdiction of any department or agency of the United States." One portion of the statute specifically states that it applies to misstatements of "a material fact." In United States v. Brantley, 786 F.2d 1322, 1326 (7th Cir.), cert. denied, 477 U.S. 908, 106 S.Ct. 3284, 91 L.Ed.2d 572 (1986) (collecting cases), we reaffirmed that "materiality is a question of law to be decided by the judge in prosecutions under 18 U.S.C. § 1001." See also United States v. Hoag, 823 F.2d 1123, 1126

(7th Cir.1987) ("[i]n those false statement statutes that require materiality as an essential element, the 'question of materiality is one of law to be decided by a judge.'" (quoting Brantley, 786 F.2d at 1327)). There is no meaningful distinction between the materiality element of § 1014 and that of § 1001. We hold that the determination of whether a false statement under § 1014 is material is a question to be resolved by the district judge, not the jury. The judgment of the district court is affirmed.

---

12. In United States v. Hoag, 823 F.2d 1123 (7th Cir.1987), we reviewed 18 U.S.C. § 1010 which prohibits making false statements on any application for a loan or extension of credit with the intent that the loan will be insured by the Department of Housing and Urban Development. We observed that, in contrast to 18 U.S.C. § 1001, § 1010's plain language does *not* include a materiality requirement. We concluded that "materiality is not a requirement for a conviction under section 1010." Id. at 1126.

We need not re-evaluate—in light of Hoag— our assumption in Henderson and Braverman that materiality is an element of § 1014 because the government has assumed both before the district court and on appeal that materiality was required.